DONAGHEY *v.* LINCOLN.

## Opinion delivered October 25, 1926.

1. EMINENT DOMAIN—DEDUCTION OF BENEFITS.—In estimating the benefits from a public improvement, the advantages and disadvantages to a particular tract should be balanced against each other, so as to ascertain the net result of the construction of the improvement, in its effect upon the assessed property.

2. EMINENT DOMAIN—DEDUCTION OF BENEFITS.—Where no question is raised as to the correctness of the assessment of benefits from the construction of a bridge under Sp. Acts 1919, p. 78, since it was the duty of the assessors to offset the damages against the benefits, it is too late, in a property owner's suit to review the action of the assessors, to raise the question that the actual benefits exceeded the benefits assessed.

3. EMINENT DOMAIN—INJURIES TO PROPERTY NOT TAKEN.—In determining the damages to a building by reason of changes in the width and grade of bridge approaches, the difference in value of the building before the improvement was made and after the improvement should be considered, and in estimating this difference the cost of restoration should be considered.

4. EMINENT DOMAIN—INJURIES FROM CONSTRUCTION OF BRIDGE.—A bridge district, created by Sp. Acts 1919, p. 78, is not responsible in damages for temporary interference with the use of abutting property by reason of construction of the bridge and changes in the grade and width of approaches, whether such changes were authorized by the municipality or not, since the bridge was a public highway and the changes were acquiesced in by the city.

5. EMINENT DOMAIN—NATURE OF INJURY.—In determining the damages to abutting store owners from a change of width and grade of a bridge approach, under Sp. Acts 1919, p. 78, allowance of damages to a strip of ground leased from the county and used to broaden the approach to the bridge, was properly refused where there was no showing of substantial injury or lessening of rental value of the stores.

6. EMINENT DOMAIN—INJURY TO PROPERTY NOT TAKEN.—In awarding damages to the owners of abutting stores for changes in the grade of bridge approaches, under Sp. Acts 1919, p. 78, allowance of damages for reduced ceiling height of the stores was properly refused, in the absence of any evidence as to the extent of the injury.

7. APPEAL AND ERROR—PRESUMPTION AS TO MASTER'S FINDING.—Where the testimony as to the cost of restoring a building neces-

sitated by a change of grade of bridge approaches was conflicting, and the master did not specifically refuse to allow architect's fees in awarding damages, it will be presumed on appeal that such item was considered in estimating the damages as part of the cost of restoration.

8. EMINENT DOMAIN—APPROPRIATION OF PROPERTY—INTEREST.—Filing of the assessment list for construction of a bridge, under Sp. Acts 1919, p. 78, was not a condemnation of the property, and consequently interest should not be allowed except from the time of injury to or taking of the property, which was the maturity date of the notice that work of cutting the wall of the building would be commenced on a certain date.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; modified.

*Moore, Smith, Moore & Trieber,* for appellant.

*Ashley Cockrill, John W. Newman* and *H. M. Armistead,* for appellee.

McCULLOCH, C. J. The Broadway-Main Street Bridge District of Pulaski County is a local improvement district created by a statute of the General Assembly of 1919 (Special Acts 1919, p. 74), authorizing the construction of two bridges across the Arkansas River connecting the two cities of Little Rock and North Little Rock, one of the bridges being known as the Broadway bridge and the other as the Main Street bridge, the latter forming a connection with Main Street, on the Little Rock side, and with Maple Street, on the North Little Rock side of the river. The width of the Main Street approach to the north side covers the full width of Maple Street up to the curb line, and the sidewalk continues from the intersecting street corner across the bridge. The approach begins at the intersection of Maple Street with Washington Avenue, which runs east and west at right angles with Maple Street.

The appellees, Charles K. Lincoln and his sister, Mrs. Shipton, are the owners of improved real estate situated in North Little Rock, on the east side of the Main Street bridge approach, and this litigation involves the question of the extent of the damage done to this property in the construction of the improvement.

The statute creating the district provides for the appointment of assessors to "assess the benefits which will accrue to all lands, railroads, tramroads, and telegraph, telephone and pipe lines within the district, from the making of the proposed improvement, and all damages which will result therefrom." It provides that the assessors shall make a return showing "the description of the property benefited, the name of the supposed owner, and the amount of the benefits and damages, together with an estimate of what the work will probably cost such property owner, and the amount which the property owner will be called upon to pay the first year." After the return of the assessors is made and filed with the county clerk, notice is given so that owners of property may have an opportunity to appear and make complaint, and there is a provision that any dissatisfied property owner "may bring suit in the chancery court of Pulaski County within thirty days to review the action of the board of assessors." All these provisions with reference to the assessments are contained in § 3 of the statute, *supra*.

The assessment list was filed with the county clerk in May, 1920, and within thirty days thereafter appellees filed separate actions in the chancery court of Pulaski County attacking the correctness of the appraisals of damages to their property made by the assessors. The causes were consolidated and tried together, but separate findings were made with reference to each piece of property owned by each of the appellees. There was a reference to a master, and there were exceptions filed to his reports by both sides, but, on hearing the exceptions, the court overruled them all and rendered a final decree on December 24, 1924, in accordance with the findings of the master. An appeal has been prosecuted by the district, and appellees have also prosecuted cross-appeals from portions of the decree adverse to their claims on certain issues.

The new Main Street bridge had been completed before the trial of the cases below, and the testimony

shows that it is a modern type structure, erected in replacement of the old bridge, which was constructed by the county many years ago, and which had gotten considerably out of repair.

The property in controversy owned by appellee Lincoln consists of a hotel building fronting west towards the bridge, but not actually abutting thereon, and a store building adjoining the hotel building on the north, and running through to Washington Avenue, and also three other store buildings fronting on Washington Avenue, designated as Nos. 124, 126 and 128. The hotel building is 60 feet square and has three stories and a basement. The first story consists of four store rooms, each 15 feet wide, fronting west towards the bridge, and the second and third stories are used for hotel purposes. The building was constructed of brick. The drugstore building is 20 feet wide and is a one-story structure. The other three stores owned by Lincoln are one-story brick buildings, 20 feet wide, fronting on Washington Avenue. The property of Mrs. Shipton consists of four store buildings adjoining the Lincoln property on the east and fronting on Washington Avenue. The second floor of the hotel building and the ground floor of the drugstore building were on a level with the approach to the old bridge, and between the two buildings and the bridge there is a triangular-shaped strip of ground owned by the county. The base of the triangle at the southwest corner of the hotel building is 19.8 feet wide, and it runs to a point at the northwest corner of the drugstore building at the intersection of Maple Street and Washington Avenue. This piece of ground was a deep hollow, far below the surface of the street and bridge approach, and, after the construction of the buildings owned by Lincoln, the latter leased the ground from Pulaski County, under a written contract, for a period of fifty years. The purpose of the county in granting this lease was, as declared in the contract, to widen the approach to the bridge, and the contract imposed upon the lessee an obligation to fill in the ground and construct a sidewalk over and above it from

his building or property line to the embankment and sidewalk of the bridge. The sidewalk was to be on a level and connecting with the sidewalk of the bridge so that the whole of the paved area could be used by the public as a part of the bridge approach. The contract was complied with by Lincoln, and the structure, as it then existed, provided a sidewalk covering the space between the bridge approach and the front of the buildings and continuing clear across the bridge. This made a sidewalk about 24 feet wide, and afforded plenty of space for the occupants of the store buildings in the hotel to display their goods for sale.

In constructing the new bridge on the site of the old one which was torn down, Maple Street was widened to the extent that a few feet were taken from the northwest corner of the drugstore building and a narrow strip was taken off the edge of the leased property next to the bridge. A triangular cut was made from the front of the drugstore building about six feet wide, thus narrowing the front. The court below made an allowance of $4,000 for this injury to the drugstore building, and neither side questions the correctness of that award. The effect of widening the approach on Maple Street was to narrow the sidewalk between the walls of the building and the curb line from 24 feet, as it existed prior thereto, to 18 feet when the new structure was completed. There was also a change in the grade of the approach on Maple Street, so as to raise it from the intersection of Maple Street and Washington Avenue to the bridge proper. The raise in front of the four stores in the hotel building was 15 inches in front of the first room on the south, and 22 inches in front of the store on the north. This change in the grade made it necessary to raise the floors of each of the four store rooms in the hotel building so as to place them on a level with the sidewalk, and in doing so the height from floor to ceiling in each of the stores was reduced from about 13 feet to a little more than 11½ feet. It also became necessary, on account of the raise in grade on Maple Street, to raise the grade on Washington Ave-

nue so as to conform to that grade. The raise at the intersection of those two streets was 3.9 feet higher than the old grade, and extended east 170 feet on Washington Avenue at a downward grade of 3.44 per cent. It was necessary to raise the floors of the brick store buildings so as to put them on a level with the raised sidewalk, and the ceiling height was reduced from 13 feet 9½ inches to about 10 feet 3½ inches. The change in the grade made it necessary to raise the floors in the other three buildings owned by Lincoln on Washington Avenue and two of the buildings owned by Mrs. Shipton, and this, of course, resulted in a slight reduction of the ceiling height.

The report of the master sets forth the findings of fact with respect to the various changes in the property and the extent of restoration and injury, and he made specific findings as to damages as follows:

Statement as to Separate Property.

Land leased from Pulaski County.

This claim disallowed.

Hotel Property.

| | |
|---|---|
| Raising floors and sidewalks | $3,015.18 |
| Damage to basement | 300.00 |
| Water mains and plumbing | 334.19 |
| Loss of rents during reconstruction | 160.00 |
| Total | $3,809.37 |

If loss of rents during construction of bridge is allowed, there should be added to the above amount ........................................................$2,335.00

Land at corner of Washington and Maple.

Value of land taken ........................................................$4,000.00

Lincoln Property, Nos. 130, 128, 126 and 124, West Washington Avenue.

| | |
|---|---|
| Cost of restoration | $ 9,967.36 |
| Damage by increase of grade | 1,350.00 |
| Loss in rentals during reconstruction | 570.00 |
| Total | $11,887.36 |

If rents during construction are allowed, to this
    total amount there should be added ................$1,935.00

Shipton property, Nos. 122, 120 West Washington<br>Avenue.

Cost of restoration ................................................$4,983.68
Damage by increase of grade ..............................  600.00
Loss of rentals during reconstruction ...............  240.00

  Total .....................................................................$5,823.68

If rentals are allowed during construction of
    the bridge, there should be added to the
    above amount ...................................................$720.00

The court, in approving the master's findings, allowed the claim for loss of rents during the construction of the bridge, and included those items in the decree in favor of each of the appellees. The master refused to make any allowance for damage to the first two buildings on the east owned by Mrs. Shipton, and also refused to allow any damage to the leasehold estate held by Lincoln under his contract with the county.

The present litigation challenges only the correctness of the appraisal of damages, and nothing else. Neither party has made an attack on the correctness of the assessment of benefits made by the assessors of the district, but appellees commenced these actions in apt time to enlarge the award of damages. So the assessment of benefits for the purpose of taxation must stand as returned by the assessors. The attack on the award of damages is a direct one, and calls for an independent investigation by the court as to the amounts to be allowed.

In the trial below, appellants offered evidence tending to show that the actual benefits accruing to the property of appellees were largely in excess of the amount of benefits assessed by the assessors of the district, and contended that this excess ought to have been considered in reduction of the damages. In other words, that the benefits proved in addition to those allowed by the assessors for taxation purposes should be balanced off against the

award of damages, thus reducing the amount of damages correspondingly. The court refused to consider that testimony, and the question of its admissibility is presented here as the principal one involved in this appeal.

Counsel rely upon two recent decisions of this court (*Gregg* v. *Sanders,* 149 Ark. 15, 231 S. W. 190, 17 A. L. R. 59; *Sain* v. *Cypress Creek Drainage District,* 161 Ark. 529, 257 S. W. 49, 258 S. W. 637) as supporting their contention. In *Gregg* v. *Sanders, supra,* the only feature of the case reviewed on the appeal involved the question whether or not, in ascertaining the damages on account of the taking of a portion of a tract of land by an improvement district, the benefits accruing to the remainder of the tract should be considered in reduction of the amount of damages to be awarded. We decided that, in view of the fact that the benefits accruing to the remainder of the tract were taxed the same as the benefits to other lands in the district, they could not be offset against the damages accruing on account of the loss of the tract actually taken. And, in announcing our conclusion on that question, we stated the converse of this rule as follows: "Damages to the property not taken may, however, be balanced off against the benefits which accrue, for damages must necessarily be taken into account in the estimate of benefits." This was but another way of saying that, in estimating benefits, the advantages and disadvantages should be balanced off against each other so as to ascertain the net result of the construction of the improvement in its effect upon the taxed property. We have no hesitancy now in reaffirming that statement of the law, for we are of the opinion that it is correct. Undoubtedly the orderly method of appraising benefits and damages is to consider the advantages and disadvantages to accrue, the extent of the injuries and the value of the enhancement, so that they may be balanced off against each other and a net result obtained; the lesser amount, either benefit or damage, being merged into the greater. The statute now under consideration provides, however, for separate appraisals of the benefits and damages, so that the one may be taxed

and the other paid. That was the method adopted by the assessors, and neither party has challenged the correctness of that method. Now, under that method of assessment, the taxable benefits must be estimated in uniformity with the assessments on other property in the district similarly situated, the advantages and disadvantages to accrue from the improvement as a whole being considered and balanced off against each other in determining the amount of net benefits; and then the estimate of damages must be based upon the direct physical effect of the construction of the improvement upon the particular piece of property being appraised, the direct advantages and disadvantages being likewise considered in reaching the result. In other words, in following out that method of separate assessments, the benefits are assessed on the same basis as all other property in the district, whereas the damages are estimated in accordance with the direct effect of the improvement upon the value of the property, considering all the advantages and disadvantages which may result. As we have already seen, there has been no question raised as to the correctness of the assessment of taxable benefits, therefore it was too late in the trial of this cause to question the assessment or to offset additional benefits against the damages.

As we understand the findings of the master, he did not fail to consider the difference in value between the building before the improvement was made and in its restored condition after the improvement was completed, and, in estimating the difference in value, the cost of restoration was considered. Our conclusion is that there was no error committed in this respect.

The only complaint made by appellants against the specific allowances made by the master in his award relates to the items allowed for loss of rents during construction of the bridge. We are of the opinion that this complaint is well founded. The master should not have included those rents in his award of damages. The authorities on this subject all hold that a municipality or

other public agency, in the construction or improvement of streets, is not responsible in damages for temporary interference with the use of abutting property. The doctrine is stated in 13 R. C. L., p. 223, as follows:

"A municipality has a right to close or obstruct a street temporarily for the purpose of repairing it, or making a public improvement therein, and may delegate its authority in this respect to one who has contracted with it to make the improvement or repairs. The use of the street for such purposes becomes paramount to its use for travel under such circumstances, and the obstruction or closing of it does not constitute a nuisance, so long as reasonable care and diligence are exercised in prosecuting the work; nor is it a damaging of abutting property for which the Constitution requires compensation to be made, although access thereto is temporarily interfered with." See also 1 Lewis on Eminent Domain, § 230; *Peck* v. *Chicago Ry. Co.*, 270 Ill. 34, 110 N. E. 414; *Slatterly* v. *St. Louis*, 120 Mo. 183, 25 S. W. 521.

This court gave approval to the doctrine in *Kansas City Southern Ry. Co.* v. *Anderson*, 88 Ark. 129, 113 S. W. 1030, where we said:

"Many consequential losses to the landowner, such as injury to business, inconvenience, expense and losses from interruption of business, are not recoverable as damages in condemnation suits."

The change of grade which caused the interruption in the use of the buildings of appellees for business purposes does not appear from the evidence to have been directly authorized by the municipality, but the bridge constitutes a public highway, and, if the city of North Little Rock did not reestablish the grade, the change was acquiesced in by the city authorities, and, as it was done for the public benefit, individuals cannot complain of the temporary interference with business.

This brings us to the consideration of the cross-appeal, upon which appellees insist upon the insufficiency of the award of damages with respect to certain items. In the first place, it is contended that something should have

been allowed for damages to the strip of leased ground covered by the pavement between the walls of the building and the bridge. The purposes in leasing the ground to appellees was, as before stated, to broaden the approach to the bridge so as to furnish a continuous passageway along the sidewalk in front of the stores and across the old bridge. The ground was unfit for any other use, and the construction of the pavement between the walls of the building and the bridge precluded any other substantial use of the ground. It is true that there was proof of construction of a small garage on the strip underneath the pavement, but it is not shown that any very substantial injury resulted from the raising of the grade or the broadening of the approach. It is also urged that the narrowing of the sidewalk in front of the stores materially affected the usable value of the store fronts because the space for displaying goods was diminished. It is not shown that there was any actual lessening of the rental value of the stores on account of the narrowing of the display space in front. We think the master was correct in refusing to allow anything on this item.

It is further contended that the master erred in failing to allow any damage for the reduced ceiling height of the stores in the hotel building. According to the testimony in the case, the reduction of the height left sufficient space for all purposes. There was expert testimony to the effect that ceiling height is an element for consideration in determining the rental value of a storeroom, but there is nothing in the testimony to base a finding upon as to the extent of such an injury in dollars and cents.

It is next contended that the master erred in refusing to allow architect's fees for restoration of the building by raising the floors. The readiest answer to this contention is that there was a conflict in the testimony as to the cost of restoration, and, as there was no specific finding by the master refusing to allow architect's fees, we must

assume that that item was considered in estimating the damages by way of cost of restoration.

Complaint is made as to the amount of cost of restoration in the way of raising the floors and reconstructing the sidewalks so as to conform to the new grade. Counsel argue very earnestly that the master and the chancellor failed to give proper force to the testimony of the experts who furnished information concerning the extent of the damage and cost of restoration, but, after comparing the finding of the master with the proof in the case, we are unable to say that the finding was incorrect.

Finally, it is insisted that the court erred in refusing to allow interest from May 11, 1920, the day of the filing of the assessment list. This contention is based upon the theory that the filing of the assessment list was tantamount to the commencement of condemnation proceedings, and that, in a condemnation proceeding, interest should be allowed on the award of damages from the date of the commencement of the proceeding. The authorities on this question are collated in the case-note to *Campau* v. *Detroit,* 225 Mich. 519, 32 A. L. R. (Mich.) 91, and it will be seen that the theory upon which most of the authorities proceed in determining this question is that the continued possession of the owner after commencement of condemnation proceedings is precarious and liable to be disturbed at any time, so that the situation amounts to a constructive taking of possession, and that interest should be allowed. These authorities, as well as the decisions of this court cited by counsel for appellees (*School District* v. *Smith,* 113 Ark. 526, 168 S. W. 1089), relate to cases in which there was a taking of the property, and none of them, so far as we have observed, apply to consequential damages arising where property is not actually taken. All of the injury in the present case was consequential, except the taking of a small part of the corner of the brick store building, and as to that, as well as to the consequential damages, the answer to the contention of appellees is that there has been no judgment of condemnation nor any formal proceedings for that

purpose. The filing of the assessment list did not in any sense constitute a condemnation of the property. On the contrary, § 18 of the statute creating the district provides for a method of condemnation similar to proceedings of that kind by railroad, telegraph and telephone companies. There having been no condemnation, there is no basis for allowing interest except from the time the injury was done to the property. The record shows that, on October 28, 1923, the commissioners of the district served notice on appellees that the work involving the cutting of the wall of the building would be commenced fifteen days thereafter, and we are of the opinion that the maturity of this notice constituted a taking of the property and established a period from which interest on the award of damages should be computed at the legal rate.

The decree in each case will be modified by excluding the award of rents during the construction of the bridge. In accordance with this modification, judgment will be entered here in favor of appellee Lincoln for the sum of $19,696.73, and in favor of Mrs. Shipton for $5,823.68, with interest on each amount at six per cent. per annum from November 12, 1923. It is so ordered.

HART, J., (dissenting). Under our Constitution, that property shall not be damaged for public use without compensation, it is no longer necessary that there should be a physical invasion of one's land in order to give a right of recovery. *Hot Springs R. Co.* v. *Williamson,* 45 Ark. 429.

Under the original plans, it was contemplated that all the buildings of appellees would be damaged by actually cutting away a part of the walls of them. On October 28, 1923, the commissioners notified appellees that they expected to begin work on the Main Street bridge at the location of their property, and the notice contained the following: "This work will involve the cutting into a part of the west wall of one or more buildings on your property, and we will be glad if you will make quick disposition as will enable us to begin the work within fifteen days."

On account of this notice, appellees were compelled to make new contracts with their tenants in conformity with the provisions of the notice, and they resulted in a depreciation in the rental value of their property. Subsequently, the commissioners changed their plans, and only one wall of any of the buildings of appellees involved in this suit was cut.

The majority opinion recognizes that the damage within the meaning of our Constitution commenced when appellees received the written notice above referred to, and it fairly and reasonably follows that the damage continued until appellees were notified that it would not be necessary to cut but one of the walls of the buildings.

It also reasonably follows that the measure of damages in such a case is the depreciation in the rental value of the buildings from the date appellees were notified that the walls of their buildings would be cut until this plan was abandoned and appellees were notified of the change in plans. I think this view of the matter was recognized and applied by this court in *Pine Bluff & Western Ry. Co.* v. *Kelley,* 78 Ark. 83, S. W. 562.

In this case the court held: ''Where a railroad company instituted proceedings to condemn a right-of-way, and used the land for a short time, and then abandoned it, the measure of damages in such case is the rental value of the land in the condition in which it was when taken for the time it was occupied, and the depreciation in value thereof by reason of timber cut and other acts done thereon by the railroad company, and the damage resulting to the remainder of the owner's land from the building of the road across it and from overflow caused by the construction thereof; but, for all other damages occasioned by torts committed or wrongs done by the railway company, the owners have remedies in actions to recover the same.''