[L. A. No. 19358. In Bank. Oct. 24, 1947.]

GUSTAVE A. L. HEIMANN et al., Appellants, v. CITY OF LOS ANGELES, Respondent.

John F. Poole and E. H. Delory for Appellants.

Ray L. Chesebro, City Attorney, Charles F. Reiche, Assistant City Attorney, and Arthur William Green, Deputy City Attorney, for Respondent.

SHENK, J.—Plaintiffs appeal from a judgment awarding compensation for damage to their real property by reason of the construction of a viaduct in the street, and from an order striking their cost bill. They claim that they are entitled to a larger award.

In 1931, plaintiffs owned parcels of real property abutting First Street, Los Angeles. In July of that year the city filed a condemnation proceeding whereby part of their land was taken for the widening of the street (*Los Angeles* v. *Savage*, No. 320308 in the superior court). They received full compensation for the land taken and for damages to the remainder by reason of the severance.

The widening was accomplished in 1932. As a part of the project, to eliminate duplication of effort in the event of future construction of a viaduct in First Street, foundations and

stanchions were built underground. These structures were carried up to a point 2 or 3 feet below the surface of the street. They were then covered and the street was paved over them, so that they were not visible on the surface.

Plans for construction of the viaduct were under consideration by the city in 1938 and 1939. Actual construction work was commenced in September, 1940, and the project was completed about October, 1942. The construction work was performed by the federal Works Progress Administration under contract with the city. One of the parcels of plaintiffs' property fronts on the viaduct and the other partially so. No offer of compensation was made by the city to plaintiffs for any taking or damage to their land by reason of the building of the viaduct, and a demand by plaintiffs in statutory form was denied.

This action for damages followed. It was alleged that wrongful acts of the city, resulting in temporary and permanent damage to plaintiffs' property were violative of article I, section 14 of the Constitution, and it was prayed that plaintiffs be compensated therefor in the sum of $34,500.

Trial before a jury resulted in a verdict awarding to plaintiffs damages in the sum of $800, and judgment for that amount was entered in their favor. On this appeal the plaintiffs do not question the sufficiency of the evidence to support the award insofar as it represents merely the item of damage for decrease in the market value of the properties subsequent to the commencement of the construction work on the viaduct in 1940. They contend that the court erroneously excluded evidence to their prejudice, erroneously charged the jury, and committed error in striking out their cost bill. The appeal is presented on an agreed statement which, so far as here pertinent, shows the following:

On the trial the parties stipulated, among other things, that the city is liable to plaintiffs "for whatever damage the presence of the said viaduct in the street occurs to or causes the said real property of plaintiffs." Thereafter expert witnesses were called by both sides and gave their opinions concerning the decrease in the reasonable market value of the properties caused by the building of the viaduct and occurring subsequent to the commencement of construction work in 1940. This testimony forms the basis of the $800 award, which is within the range of the figures given by the witnesses and is slightly above the amount fixed by defendant's experts.

While plaintiffs and their expert witnesses were on the stand certain questions were propounded to them, to which defendant objected upon the ground that the evidence offered was incompetent, irrelevant, and immaterial; not within the issue of the case; too remote; that no foundation had been laid to tend to prove that the city had constructed the viaduct, but that on the contrary the evidence indicated that the viaduct had been constructed by the Works Progress Administration of the United States and that the city was therefore not liable for any taking or use of the plaintiffs' property during the course of construction. Pursuant to the allegations of the complaint the plaintiffs sought to introduce in evidence substantially the following:

(1) Proof that the construction of the viaduct in fact commenced in 1931 or 1932, and not in 1940; that there was no cessation of the work but that the construction continued up to completion of the viaduct in 1942; (2) Proof that there likewise continued over the period 1931 or 1932 to 1942, a taking and damaging of the properties and loss of use, and that after the paving over of the foundations in 1932 plaintiffs were unable to sell their properties or to interest real estate dealers in selling them; that the proposed construction "killed" any opportunity to make a sale at the reasonable market value, or at any price at all; (3) Proof of prices paid by the city and other condemnors for neighboring properties; (4) Proof of (a) the amount of damage due to loss of use of the properties by reason of the construction of the foundations in 1932; (b) the amount of damage due to loss of use from commencement of construction in 1940 to completion in 1942; (c) the amount of damage due to loss of use because of an unreasonable delay of 16 months in the performance of the actual construction work; (d) the amount of damage due to loss of use because of a continuous taking and construction from 1932 to October, 1942, with an 8-year lapse which did not constitute a cessation of the construction work; (e) the amount of damage due to loss of use by reason of earth, rock, and gravel placed on and adjacent to the plaintiffs' property, and to the erection of sawmills, sheds, and the like, and the maintenance of materials and equipment used in the construction work between September, 1940, and October, 1942 (to this offer of proof the city objected on the ground that there was no evidence that the materials and implements were placed on the grounds by it but on the contrary the evidence

tended to show that they were placed in the street in front of the properties by the Works Progress Administration and that the city was in nowise responsible for any such alleged taking or use of the properties.); (f) the amount of damage due to loss of use of the properties by reason of the closing of streets abutting them during the period from September, 1940, to about November, 1942, to which evidence the city also objected on the aforesaid grounds; (5) Proof of interest at the legal rate of 7 per cent upon the reasonable market value of the properties from the time of paving over the foundations in 1931 or 1932 to October, 1942, and the amount of interest at the same rate on the reasonable market value of the properties and compensation for loss of use during the construction period September, 1940, to October, 1942.

This entire line of offered proof was excluded by the trial court. However, plaintiffs were permitted to examine the city engineer of bridge design, who stated that he designed the viaduct; that construction started in 1940 and not in 1932; that the foundations which had been laid in 1932 were used but were enlarged; that during the course of the construction there were no bridge supervisors on the city pay roll; that the city laboratory was used to some extent to test materials and there was at all times at least one city inspector in the field at the site of the work; that while concrete was being poured there was more than one inspector on the job; and that the city made the survey and made the plan and design of the bridge.

The witness further stated that he believed that at times the roadways were entirely closed to traffic, but he only went to the site occasionally; that he did not remember any stock or material piles at either end of the viaduct, or whether any structures were built on plaintiffs' properties, but that a large quantity of material was stored in an adjoining street, although there was enough unobstructed roadway left for the passing of traffic; that tool sheds were also erected in the streets.

A civil engineer of the city, who had been in its employ for about 25 years, also appeared as a witness for plaintiffs. He testified that the bridge plans were drawn under his general direction but that he did not supervise the construction; that supervision was done by the Works Progress Administration; that the city had inspectors on the job who saw to it that the work was done in accordance with the plans and specifications and inspected it in the same way as a private contractor's

job; that it had to pass city inspection before being accepted by the city; that in addition the city had surveyors on the job and city maintenance crews may have done some paving work.

The city inspector who had charge of inspection of the viaduct at the time of its completion testified that the construction work and the Works Progress Administration employees were not under his supervision or direction but that the work was under his inspection; that in one or two cases forms were rebuilt prior to the pouring of cement in order to pass inspection; that the general plan of the structure was not changed after it was originally laid down, but the false work design was changed several times; that he saw a blacksmith's shop, sawmill, and material piled in the streets and saw "some material piled on vacant lots."

Defendant city called to the witness stand only its three expert appraisers. On the evidence so produced the cause was submitted to the jury, with the result aforesaid.

After judgment plaintiffs filed their cost bill. Defendant moved to strike it on the ground that the judgment was such as could have been rendered by the municipal court, and that costs were therefore not recoverable by plaintiffs (Code Civ. Proc., § 1032). The motion was granted.

█ It has long been the rule that in a proceeding in eminent domain, the party seeking condemnation should be required to pay not only his own costs, but all proper costs of the owner of the land incurred in good faith. The reason for the rule is stated in the case of *San Francisco* v. *Collins* (1893), 98 Cal. 259, at page 262 [33 P. 56]:

"To require the defendants in this case to pay any portion of their costs necessarily incidental to the trial of the issues on their part, or any part of the costs of the plaintiff would reduce the just compensation awarded by the jury, by a sum equal to that paid by them for such costs. . . . As the property cannot be taken until the compensation is paid, and as it cannot be paid until it is ascertained, the duty of ascertaining the amount is necessarily cast upon the party seeking to condemn the property, and he should pay all the expenses which attach to the process. Any law which casts this burden upon the owner should, in our opinion, be held to be unconstitutional and void." See also *Yolo etc. Water Co.* v. *Edmands,* 188 Cal. 344 [205 P. 445]; *Oakland* v. *Pacific Coast Lumber etc. Co.,* 172 Cal. 332 [156 P. 468, Ann.Cas. 1917E 259]; *San Joaquin etc. Irr. Co.* v. *Stevinson,* 165 Cal. 540 [132 P. 1021]; 10 Cal.Jur. p. 432, § 121.

Here the proceeding is not one brought by a condemnor, but is an action wherein the owners seek compensation under article I, section 14 of the Constitution for the taking and damaging of their properties for a public use without just compensation having first been made or paid into court. In both forms of action the result is the same in that in each the property owner receives compensation for the invasion of his property rights; only the procedure in arriving at the result is different (*People* v. *Ricciardi,* 23 Cal.2d 390, 400 [144 P.2d 799]).

In cases instituted by the property owner the reason for allowing him costs in case of recovery is even stronger than in condemnation cases, for in the former, instead of an offer of compensation or suit to condemn, there has been a wrongful taking and damaging of private property without permission of the owner or effort to first compensate him, in consequence of which the owner has been forced to initiate the litigation. If costs should be assessed against him, his recovery would be diminished by that amount and he would be to that extent deprived of the full measure of compensation to which he is justly entitled. (*Collier* v. *Merced Irr. Dist.,* 213 Cal. 554 572 [2 P.2d 790].)

Jurisdiction in eminent domain lies in the superior court (Code Civ. Proc., § 1243), and the discretion conferred upon that court in taxing costs (Code Civ. Proc., § 1255), is held to be limited by article I, section 14 of the Constitution (*San Francisco* v. *Collins, supra,* 98 Cal. at p. 262, and other cases above cited). Similarly, in actions like the present, the constitutional provision must be held to be a limitation upon the requirement of section 1032 of the Code of Civil Procedure that the plaintiff may not recover costs when the judgment is one which could have been rendered by a municipal court. The order granting the motion to strike the cost bill was therefore erroneous.

The trial court properly refused to permit plaintiffs to introduce evidence of damage suffered by reason of the construction of the foundations under the pavement in 1932 and the claimed continuation of that construction without cessation until 1942. Admittedly, plaintiffs were fully compensated for any taking of or damage to their properties suffered by reason of the widening of the street in 1932 and the construction of the improvement in the manner proposed (Code Civ. Proc., § 1248). If there was a further element of damage by reason

of the placing of foundations under the pavement, that damage occurred in 1932 and recovery of the item should then have been sought. At the time of the commencement of the present action the statute of limitations had long since run against any such claim.

The assertion that the construction continued from 1932 until 1942 is shown by undisputed evidence to be without foundation in fact. The original plan contemplated the possibility of erection of a steel bridge. As constructed, the viaduct was of concrete and the old foundations were enlarged to accommodate it. With respect to this structure plaintiffs state in their opening brief: "The City Engineer's office was ordered by the City Council to prepare plans and the same were duly considered by all parties from July 6, 1938, to August 23, 1939, when the same were approved." This statement of itself sufficiently negatives plaintiffs' claim of construction work continuing from the year 1932.

The mere threat or possibility of construction of a public work is not actionable. In a case involving a contemplated or future possible change of grade (*Eachus* v. *Los Angeles etc. Ry. Co.*, 103 Cal. 614, at pp. 621-622 [37 P. 750, 42 Am.St.Rep. 149]), this court held that until there was a change in the physical condition of the street, the plaintiff was not damaged, notwithstanding the fact that an ordinance had theretofore been passed authorizing a change of grade. See, also, *Atchison T. & S. F. Railway Co.* v. *Southern Pac. Co.*, 13 Cal.App.2d 505, 517 [57 P.2d 575].

The trial court properly refused to allow witnesses for plaintiffs to testify on direct examination to prices paid by the city for neighboring property. Although the question of the admissibility of such evidence on direct examination is one upon which there is a division of authority, this state is committed to the rule of nonadmissibility, reaffirmed in the late case of *City of Los Angeles* v. *Cole*, 28 Cal.2d 509, at page 517 [170 P.2d 928], in the following language: "[I]t is not competent for either party in a condemnation proceeding to put in evidence the amount paid by a condemning party to the owners of adjacent lands. . . ."

A more vexing question is presented by the contention of plaintiffs that they should have been permitted to introduce evidence of various elements of alleged temporary damage suffered over the 1940-1942 period of construction work, as distinguished from the permanent depreciation in the market

value of the property caused by the existence of the viaduct for which the $800 award was made. These claimed elements of temporary damage arise from an alleged unreasonable delay of 16 months in the performance of the construction work, and an alleged loss of use over the 1940-1942 period due to the piling of earth, rock, and other materials in the streets and the erection of sawmills, sheds, and other structures, the accumulation of waste materials and rubbish on and near plaintiffs' premises, the partial obstruction and closing of streets, and the like.

On the question of compensation for elements of temporary damage, a text writer discussed the problem as follows: "Obviously, the determination of the question as to whether a temporary interference with property rights constitutes a taking or damaging within constitutional and statutory guaranties is dependent on the facts of the particular case and the jurisdiction in which the question is presented. In general the law permits a recovery only for property permanently depreciated, taken, or injured by the making of public improvements. The mere fact that the improvement renders for a time the use of property more inconvenient is not a 'taking,' there being no physical invasion of the real estate of a private owner. And it is ordinarily held that a municipality is not liable for damages consequent on the performance of its duty to keep its streets in repair, pave and repave them, and to build, repair, and rebuild bridges, etc.'' (18 Am.Jur. § 142, pp. 769, 770; see, also, 29 C.J.S., § 113, p. 924-926, and cases cited; L.R.A. 1918E, pp. 993, 995.)

It would unduly hinder and delay or even prevent the construction of public improvements to hold compensable every item of inconvenience or interference attendant upon the ownership of private real property because of the presence of machinery, materials, and supplies necessary for the public work which have been placed on streets adjacent to the improvement. But it does not follow that an unnecessary and substantial temporary interference with such property rights or an actual though temporary invasion of the right of possession of private property during construction should take place without redress.

An example of an actionable temporary injury to a property right is found in the case of *Jacobsen* v. *Superior Court,* 192 Cal. 319 [219 P. 986, 29 A.L.R. 1399], where an entry on private land made in advance of any condemnation proceed-

ing, for the purpose of taking measurements, testing rock and soil formations by boring and excavation, etc., was held to constitute an unlawful invasion of the property rights of the landowner, compensable under the constitutional provision. This court said (p. 328) : ''It is idle to attempt to argue that such entry, occupation, disturbance, and destruction of the properties of these petitioners would not constitute such an interference with their exclusive rights to the possession, occupation, use, and enjoyment of their respective holdings as would amount to a taking and damaging thereof to the extent and during the period of such entry upon said lands and of the operations of the corporation thereon.''

On the other hand, the construction of the public improvement may involve many noncompensable factors. Generally it has been said: ''The damage for which compensation is to be made is a damage to the property itself, and does not include a mere infringement of the owner's personal pleasure or enjoyment. Merely rendering private property less desirable for certain purposes, or even causing personal annoyance or discomfort in its use, will not constitute the damage contemplated by the constitution; . . .'' (*Eachus* v. *Los Angeles etc. Ry. Co., supra,* 103 Cal. 614, 617; *Beckham* v. *City of Stockton,* 64 Cal.App.2d 487, 502-503 [149 P.2d 296].)

It is not clear whether the trial court's exclusion of evidence was based upon its conclusion that the claimed elements of temporary damage were nonactionable, or upon its conclusion that since the construction work was performed by the Works Progress Administration, the city could not be held liable for any taking or use of the property during the construction period. In either case the ruling was erroneus. ■ The fact that the work was performed by the Works Progress Administration does not necessarily exonerate the city.

■ Where a public improvement has been constructed and private property has been taken or damaged for a public use it is immaterial that the work of construction may have been done by a contractor. The public agency authorizing the work is the party to be held liable under the constitutional provision for damage resulting from the exercise of its power. If the public work is constructed according to the plans and specifications furnished by such public agency and upon completion is accepted by it, this is sufficient to fix liability. (*Tyler* v. *Tehama County,* 109 Cal. 618, 626 [42 P. 240] ; 10 Cal.Jur. p. 438, § 127.) Or, as said in a recent case (*Veterans' Welfare*

*Board* v. *City of Oakland,* 74 Cal.App.2d 818, 832 [169 P.2d 1000]) : "If the contractor follows the plans and specifications furnished by the public agency, and damage results to the adjacent property, the public agency and not the contractor is liable. (*Marine Mun. W. Dist.* v. *Peninsula P. Co.,* 34 Cal. App.2d 647, 652 [94 P.2d 404] ; see, also, *De Baker* v. *Southern Cal. Railway Co.,* 106 Cal. 257, at p. 284 [39 P. 610, 46 Am.St.Rep. 237].) Whether the contractor followed the plans or specifications or not, if plaintiffs' constitutional rights have been adversely affected they are entitled to compensation from the public agency authorizing and supervising the work." (See, also, *Newman* v. *City of Alhambra,* 179 Cal. 42, 45 [175 P. 414] ; *Perkins* v. *Blauth,* 163 Cal. 782, 789 [127 P. 50] ; *Eachus* v. *City of Los Angeles,* 130 Cal. 492 [62 P. 829, 80 Am.St.Rep. 147] ; *De Baker* v. *Southern Cal. Railway Co.,* 106 Cal. 257, 284 [39 P. 610, 46 Am.St.Rep. 237] ; *Marin Mun. W. Dist.* v. *Peninsula P. Co.,* 34 Cal.App.2d 647; 652 [94 P.2d 404] ; *Hume* v. *Fresno Irr. Dist.,* 21 Cal.App.2d 348, 354 [69 P.2d 483] ; *Northwestern Pac. R. R. Co.* v. *Currie,* 100 Cal.App. 173, 175 [279 P. 1057].)

The settled statement does not show the basis of the court's ruling of exclusion or whether the proffered evidence tended sufficiently to support plaintiffs' claims. The offer was apparently general and defendant's objection was sustained to the entire line of proof sought to be introduced. This being so, it cannot be held that the offer was insufficient or that a more specific offer was a prerequisite to review on appeal. (*Lawless* v. *Calaway,* 24 Cal.2d 81, 91 [147 P.2d 604] ; *Tomaier* v. *Tomaier,* 23 Cal.2d 754, 760 [146 P.2d 905] ; *Caminetti* v. *Pacific Mut. Life Ins. Co.,* 23 Cal.2d 94, 100 [142 P.2d 741].)

The general offer was to submit proof which might tend to establish some elements of actionable injury. The court should have entertained such of this evidence as tended to show the alleged temporary injury; whether the alleged damage was within the contemplation of the plans and specifications for the public improvement or whether it consisted of a private act of the Works Progress Administration so separated from any purpose of the public improvement as not to constitute the damaging of private property for public use; also whether the elements of injury so shown were actionable. Had such a record been made, either by the admission of evidence or by its exclusion upon specific offers of proof,

the issue of just compensation for all elements of actionable injury could then have been submitted to the jury under proper instructions, and the propriety of its verdict as well as the correctness of the court's rulings and instructions could have been determined upon the appeal. The method employed, of a blanket exclusion of proof, practically precluded plaintiffs from procuring a determination on appeal of their right to damages for temporary injury.

Whether the plaintiffs were able to prove a substantial temporary actionable impairment of their property rights during the construction period under the allegations of their complaint is beside the question. They should have been permitted to attempt to make out their case so that the court from the evidence or from a specific offer of proof could rule upon asserted actionable elements of damage.

Plaintiffs contend with good reason that they are entitled to interest at the legal rate on the amount of damages suffered and that such interest should be computed from the time injury was inflicted and not merely from the time of entry of judgment.

In most jurisdictions, interest is allowable in condemnation cases on the same theory that supports the award of costs in those cases, that is, interest is allowable as part of the just compensation required by the Constitution to be paid to the owner for property taken (96 A.L.R., cases collected in note pp. 150-206; 111 A.L.R. 1304). In this state there is not only a recognition of the majority rule and of the reasoning which supports it (*Metropolitan Water Dist.* v. *Adams, supra,* 16 Cal.2d at pp. 681, et seq., citing *Danforth* v. *United States,* 102 F.2d 5; *Seaboard Air Line R. Co.* v. *United States,* 261 U.S. 299, 306 [43 S.Ct. 354, 67 L.Ed. 664]; *Jacobs* v. *United States,* 290 U.S. 13, 16-17 [54 S.Ct. 26, 78 L.Ed. 142]), but there is also a provision by statute that if the condemnor is put in possession by court order prior to the conclusion of the litigation, the compensation and damages awarded shall draw lawful interest from the date of the order (Code Civ. Proc., § 1249). See, also, *Los Angeles Co. Flood Control* v. *Hansen,* 48 Cal.App.2d 314, 316 [119 P.2d 734]; *City of Los Angeles* v. *Aitken,* 32 Cal.App.2d 524 [90 P.2d 377]; 10 Cal.Jur. § 64, p. 353.

In the Metropolitan Water District case, *supra,* (16 Cal.2d at p. 681), it is said, quoting from *Seaboard Air Line R. Co.* v. *United States, supra* (261 U.S. 299, at p. 306): "It is ob-

vious that the owner's right to just compensation cannot be made to depend upon state statutory provisions. . . . The requirement that 'just compensation' shall be paid is comprehensive and includes all elements and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation. . . .'' See, also, *Shoshone Tribe* v. *United States*, 299 U.S. 476, 496 [57 S.Ct. 244, 81 L.Ed. 360], and cases there cited.

In actions instituted by the property owner there is as much reason as in condemnation cases to allow interest prior to judgment where the right of possession of the owner has been infringed. He has been forced to initiate the litigation and, if denied interest, he is deprived to that extent of the full measure of compensation to which the Constitution says he is justly entitled.

The authorities are by no means uniform in their holdings with regard to the time from which interest should be computed. (See 18 Am.Jur., § 272, et seq., pp. 912 et seq.; 29 C.J.S., § 176, pp. 1056-1059; 96 A.L.R., *supra*, pp. 150-206; 111 A.L.R. 1304; 2 Lewis on Eminent Domain, § 742, pp. 1319-1326.) But if the property owner is to be compensated in the full amount to which he is justly entitled, it seems apparent that as to a taking of property the same rule should obtain as in condemnation cases, and as to a damaging of property, interest should run from the date the damage is inflicted or at least from the commencement of suit. As said in *Taylor* v. *Bay City St. Ry. Co.*, 101 Mich. 140 [59 N.W. 447, 449]: ''Complaint is made of the instruction to the jury to add interest from the date of the commencement of suit. The authorities are not uniform upon this subject. The old rule undoubtedly was that interest could not be allowed upon unliquidated damages, and, in actions of tort, damages are of course unliquidated. The tendency of courts has been, however, to set this rule aside, and adopt the more reasonable one, in cases of injury to property, that the jury must first determine the actual damage sustained, and allow interest upon that sum from its date. (Citing cases.)''

In *Dallas County* v. *Barr* (Tex.Civ.App), 231 S.W. 453, 456, an action under the constitutional provision to recover for a damaging of property, the court said: ''Interest may be allowed as damages. It is proper, we think, in this case, to calculate it from the date of the injury, and not from the date of the judgment. The fact that the amount claimed at

the time of filing the suit was unliquidated does not affect the right to recover interest as part of the damages in this kind of action. (Citing cases.)'' See, also, *Donaghey* v. *Lincoln*, 171 Ark. 1042 [287 S.W. 407].

Plaintiffs were not prejudiced by any alleged error in the charge to the jury. Certain instructions dealing with the police power seem to have been unnecessary, but were mere surplusage.

The judgment is reversed and the cause is remanded for further proceedings consistent with the views herein expressed.

Gibson, C. J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I concur in the judgment of reversal but cannot agree with the holding in the majority opinion that in an eminent domain action, evidence of sales of similar property in the vicinity is not admissible on the issue of the value of the property involved therein.

I have expressed my views on this proposition in my dissent in *City of Los Angeles* v. *Cole*, 28 Cal.2d 509, 519 [170 P.2d 928], but there is more to be said on the subject which I believe requires the majority of the court to give further consideration to the matter. *The rule stated is squarely contrary to the statutory law of this state.* (I pointed that out in my dissent in the Cole case, but now propose to demonstrate the inescapable truth of the above statement.) *In 1937,* the Legislature added section 1872 to the Code of Civil Procedure. It is a *new* section embodying a matter never before stated in the statutory law, and reads: ''Whenever an expert witness gives his opinion, he may, upon direct examination, be asked to state the reasons for such opinion, and he may be fully cross-examined thereon by opposing counsel.'' The expert witness may give the *reasons* for his opinion of value. If some of his reasons are in truth and in fact based upon sales of similar property in the neighborhood, how can he possibly be forbidden to give them under section 1872? That section puts no limit on the scope, nature or character of his reasons. He may give his reasons, whatever they may be. How, then, may some of his reasons (sales of similar property in the community) be excluded and others admitted? Aside from those considerations, however, the authorities that announced the rule of exclusion of other sales *were based*

*on the proposition that the expert valuation witness could
not give the reasons for his value opinion on direct examina-
tion.* In one of the first cases on the subject in this state, it
is said: ''But, while the opinions of witnesses thus qualified
by their knowledge of the subject are competent testimony,
they cannot, upon the direct examination, be allowed to tes-
tify as to particular transactions, such as sales of adjoining
lands, how much has been offered and refused for adjoining
lands of like quality and location, or for the land in ques-
tion, or any part thereof, or how much the company have
been compelled to pay in other and like cases—*notwithstand-
ing those transactions may constitute the source of their
knowledge.''* (*Central Pac. R. R. Co.* v. *Pearson,* 35 Cal. 247,
262.) (Emphasis added.)  It is said in *Clark* v. *Willett,* 35
Cal. 534, 544: ''While the opinions of such witnesses may
be founded mainly upon their observation and experience
in other like cases, it is well settled that they cannot, on the
direct examination, be questioned as to particular instances.
*The reason of this rule is obvious. Different witnesses might
have different theories. Their opinions might be founded
upon the observance of several and distinct instances. If
allowed to adduce one, they may adduce all.* The opposite
party would have a legal right to controvert each particular
case mentioned by the witnesses, and yet be unable to avail
himself of the right because of his inability to anticipate the
cases mentioned and prepare for their investigation.'' (Em-
phasis added.)  It is said in *De Freitas* v. *Town of Suisun
City,* 170 Cal. 263, 266 [149 P. 553]: ''By preliminary ques-
tions the examiner should elicit the facts relating to the
qualifications of the witnesses, for example, *that he has seen
and examined the land, or that he knows something of its
character and condition, or the market values of land in that
vicinity,* if such values have been established, or the values
of land similarly situated, and the like. He may, thereupon,
be asked to give his opinion of its respective values with and
without the use of the water in question. From such evidence
the court or jury can estimate the amount of damage caused
by the deprivation of the water, if they shall find that there
is such and that it is produced by defendant's tunnel. The
weight of the testimony of such witness will, of course, de-
pend upon the knowledge he shows in his answers to the
preliminary questions and on cross-examination. He should
not be asked regarding *specific facts* in the examination in

chief." (Emphasis added.) This court stated in *Estate of Ross,* 171 Cal. 64, 66 [151 P. 1138]: "The party calling a witness to give his opinion on value may qualify him by showing his familiarity with the property and with other property in the neighborhood, his experience in the business, his familiarity with the state of the market and with sales of similar property in the vicinity, and any other facts tending to show his knowledge of the subject and capacity to give an opinion thereon. *But while the fact that he knows of sales made and of the prices obtained may be elicited, the prices given in any particular instance are not admissible, except as stated, on the cross-examination* of the opposing party, if he sees fit to make the inquiry." (Emphasis added.) The thought expressed in all those cases is that the expert can give general reasons for his opinion, but not specific reasons. There is no such limitation in section 1872, and *this court should read none into it.* To do so is to make the adoption of the section a wholly idle gesture. Such cases as *Santa Ana* v. *Harlin,* 99 Cal. 538 [34 P. 224]; *Spring Valley W. W.* v. *Drinkhouse,* 92 Cal. 528 [28 P. 681]; *City of San Luis Obispo* v. *Brizzolara,* 100 Cal. 434 [34 P. 1083]; and *City of Los Angeles* v. *Hughes,* 202 Cal. 731 [262 P. 737], merely follow the Pearson case. They were all decided before 1937, when section 1872 of the Code of Civil Procedure was enacted. It is obvious that in enacting said section the Legislature intended to change the rule announced in the last cited cases which was and is out of harmony with the weight of authority and in conflict with the general rule in other jurisdictions as appears from the authorities cited in my dissenting opinion in *City of Los Angeles* v. *Cole,* 28 Cal.2d 509, at pages 520-521 [170 P.2d 928]. The holding in the majority opinion, which reaffirms the holding in the Cole case, in effect nullifies the above-mentioned code section by rendering it meaningless.

Schauer, J., concurred.

Respondent's petition for a rehearing was denied November 20, 1947.