ARKANSAS STATE HIGHWAY COMMISSION *v.*
Charles K. POST, Shelby Jean Post, and First Financial
Savings and Loan

96-1403                                        955 S.W.2d 496
Supreme Court of Arkansas
Opinion delivered October 30, 1997

*Robert L. Wilson*, Chief Counsel, *Barbara A. Griffin* and *Lawrence W. Jackson*, Staff Attorneys, for appellant.

*Ronald L. Griggs*, for appellee.

DAVID NEWBERN, Justice. This is an eminent domain case. For the purpose of widening a highway, the Arkansas State Highway Commission ("the Commission") condemned .14 acres of frontage which was part of a tract owned by the appellees Charles and Shelby Post. The Posts reside on the remaining portion of the tract consisting of some 4.2 acres. Appellee First Financial Savings and Loan holds a mortgage on the Posts' property. Along with its condemnation complaint, the Commission deposited $1,600 into the court registry as "just compensation." The Posts contended that the deposited amount was inadequate, and a jury trial was held to determine proper compensation. The Commission's liability for the taking was not contested. A judgment was entered upon a jury verdict awarding the Posts $7,000, and the Commission appealed. The Arkansas Court of Appeals affirmed by an opinion not designated for publication. *Arkansas State Hwy. Comm'n v. Post,* No. CA95-906 (Nov. 6, 1996). We review the decision of the Trial Court as if it had come to this Court in the first instance. *See Allen v. State,* 326 Ark. 541, 542, 932 S.W.2d 764, 765 (1996). We granted review and now reverse and remand on three of the four points raised by the Commission.

We hold that the Trial Court erred by (1) requiring the party who did not have the burden of proof, *i.e.,* the Commission, to

present its case first; (2) allowing the Posts to introduce a photograph of the temporary conditions on their property caused by ongoing construction; and (3) refusing to strike the speculative testimony of Peter Emig, the Posts' expert witness, regarding the property's after-taking value. As a new trial is in order, we need not consider the Commission's fourth argument that the damages verdict was excessive.

## 1. Order of proof

Over the Commission's objection, the Trial Court ruled that the Commission would present its case before the Posts presented their case. Ms. Griffin, counsel for the Commission, was not permitted to make an objection on the record until after she had concluded the Commission's case. She asserted that the Posts had the burden to prove that the $1,600 deposit was inadequate and that they therefore should have proceeded first. Ms. Griffin argued that the Commission had been prejudiced by "having to go forward first and having the burden of proof placed on us." She maintained that the Commission had prepared its case on the assumption that its presentation of evidence would follow the Posts' and that its witnesses had expected to be in the position of rebutting the testimony given by the Posts' witnesses. Mr. Griggs, counsel for the Posts, responded that the Commission had the burden of proving the value of the Posts' property and that the Commission had not been prejudiced by the Trial Court's ruling.

The Trial Court stated that its ruling caused only "minimal prejudice" to the Commission and that the Commission would have the opportunity to present rebuttal evidence after the Posts completed their case. The Trial Court referred to Ark. Code Ann. § 27-67-316 (Repl. 1994), which provides that eminent domain actions should proceed "as in other civil cases," and observed that, in the pleadings, the Commission was listed as the plaintiff and the Posts as the defendants. The Trial Court agreed with the Commission that the Posts would have the burden of proving their entitlement to the damages claimed and said that it would make that clear in a jury instruction. The Trial Court later instructed the jury that "the burden of proof is on the landowner

to prove his claim for just compensation due him by a preponderance of the evidence."

■ The order of trial in civil cases is clearly prescribed by Ark. Code Ann. § 16-64-110 (1987). Subsection (3)(A) of that statute provides, "The party on whom rests the burden of proof in the whole action must first produce his evidence." In an eminent domain proceeding such as this one, the "whole action" is devoted to allowing proof that the landowners have not been adequately compensated for the taking. The law clearly provides that they are to present their proof first.

■ In *Springfield and Memphis Railway v. Rhea,* 44 Ark. 258 (1884), we held that it was proper for the defendant landowner "to open and close" the case because he had the burden of proof on the issue of his entitlement to damages. *Id.* at 260. That case was followed by the Court of Appeals in *Property Owners Improvement Dist. 247 v. Williford,* 40 Ark. App. 172, 843 S.W.2d 862 (1992), in which it was held that the landowner had the right to "open and close" in the presentation of evidence and argument to the jury.

■ In the case at bar, the Trial Court should have required the Posts to present their evidence first because "the burden of proof in the whole action" rested on them. § 16-64-110(3)(A). The Trial Court identified no "special reasons," and we can think of none, that warranted a departure from the order prescribed by § 16-64-110(3). Thus, we must conclude the Trial Court's failure to follow the procedure outlined in this provision was erroneous.

■ The error was prejudicial. Although the Trial Court correctly instructed the jury that the Posts had the burden of proof with respect to the adequacy of the $1,600 deposit, the unexpected decision to rearrange the order of proof unfairly hindered the Commission's ability to present its case. Having relied on the procedures long established by statute and case law, the Commission reasonably expected that the Posts would present their case first, and it tailored its own case to be in the form of a rebuttal. The Commission was put at an unfair disadvantage when it was made to proceed in the posture of a plaintiff and present what was in essence a rebuttal case at the beginning of trial. The Commis-

sion could not have anticipated this unorthodox procedure, and we cannot say that the eleventh-hour surprise encountered by the Commission was harmless.

## 2. Construction photograph

During the Posts' case-in-chief, the Posts' expert witness, Peter Emig, testified that the value of the Posts' land prior to the taking was $73,000 and that the value after the taking was $55,000. The Posts moved to introduce into evidence the appraisal report that Mr. Emig had produced and referred to during his testimony. The appraisal report included several photographs of the Posts' home and surrounding land.

One of the photographs included in the appraisal report was taken from the right-of-way in front of the Posts' home. The highway, located to the east of the home and right-of-way, appears on the far right side of the photograph. The driveway leading from the highway to the Posts' home is in the foreground, toward the bottom of the photograph. The middle portion of the photograph depicts three trees standing in the Posts' front yard. In the background, toward the top of the photograph, is the right-of-way to the north of the home. That portion of the photograph depicts piles of dirt and dead trees that appeared to have been cut in the course of construction work.

The Commission objected to the introduction of the photograph and suggested that the photograph was prejudicial because it might lead the jury to believe that the dead trees would remain on the land after completion of the construction project and affect the value of the property. The Posts responded that the photograph would not prejudice the Commission and that it simply revealed the part of the land that was being "taken." The Trial Court ruled that the photograph could be admitted because it depicted "the land at the time of the taking" and because it showed part of the basis for Mr. Emig's opinion and was an "accurate reflection of the property at the time he based his opinion on it." The Trial Court acknowledged that the photograph "obviously shows construction," but it stated it could not "see how that's going to be prejudicial."

Mr. Griggs questioned Mr. Emig about the photograph as follows:

> Q. Okay. Now, turn to the third page and it shows a photograph and I believe the caption is "Current construction of the right-of-way as seen from the right-of-way in front of the home," is that correct?
>
> A. That is correct.
>
> Q. Now, that is not the right-of-way as it will exist after the taking, is it? It's not gonna look like that after the taking, is it?
>
> A. The front of the property, once the trees are removed, will look like the area in the background.
>
> Q. Okay. And so those are trees that will be removed from the taking?
>
> A. My understanding is those are the trees.

■ The Trial Court erred by admitting the photograph of the piles of dirt and dead trees that had resulted from the ongoing construction work. Evidence is inadmissible in partial-taking cases when it pertains to the temporary conditions of the property during the course of construction. Such evidence does not assist the jury in determining "just compensation" in a partial-taking case because it is irrelevant to "(1) the value of the part taken; (2) the value of the part taken plus the damages to the remainder; [or] (3) the before- and after-value rule." *Arkansas State Hwy. Comm'n v. Frisby,* 329 Ark. 506, 508, 951 S.W.2d 305 (1997), *quoting Arkansas State Hwy. Comm'n v. Barker,* 326 Ark. 403, 405, 931 S.W.2d 138, 140 (1996). Temporary conditions prevailing on the land during the course of a construction project simply have no bearing on the worth of the land prior to the taking or what its worth will be after the project is completed. Thus, in a partial-taking case, evidence of temporary conditions caused by ongoing construction is irrelevant, as well as potentially misleading and prejudicial, and should not be admitted. *Arkansas State Hwy. Comm'n v. Ptak,* 236 Ark. 105, 364 S.W.2d 794 (1963); *Donaghey v. Lincoln,* 171 Ark. 1042, 287 S.W. 407 (1926); *City of Fort Smith v. Findlay,* 48 Ark. App. 197, 893 S.W.2d 358 (1995).

■ We note the Posts' suggestion that Mr. Emig, in his testimony, clarified that the conditions depicted in the photograph

were not permanent and that the property would look differently after completion of the construction project. That testimony supposedly cured any prejudice that resulted from the admission of the photograph. Nothing in Mr. Emig's testimony could have had such a remedial effect. When asked whether the right-of-way depicted in the photograph would look differently after the taking, Mr. Emig did not answer "yes." Rather, he testified that "[t]he front of the property, once the trees are removed, will look like the area in the background." As we noted, the "area in the background" of the picture contains the piles of dirt and dead trees. Mr. Emig's testimony, rather than suggesting the piles would be cleared after the project was complete, tended to suggest that the entire property, for an unspecified amount of time, would eventually be covered with dead trees. This testimony in no way clarified to the jury that the conditions depicted in the photograph were merely temporary. The error was not harmless.

### 3. Expert testimony on "after value"

Mr. Emig testified during the Posts' case-in-chief that the value of the Posts' land before the taking was $73,000 and that the value after the taking was $55,000. Mr. Emig testified that there are three approaches to valuing property — the market approach, the cost approach, and the income approach. He stated that he determined the "before value" using the market approach. Mr. Emig testified that he considered three sales of property similar to the Posts' property and adjusted for the differences between those properties and the Posts' property. Relying on these sales, Mr. Emig concluded the value of the Posts' property before the taking was $73,000.

Mr. Emig testified that he was unable to use the market approach to determine the property's "after value." In his appraisal report, Mr. Emig wrote that, "[t]ypically, three comparable sales are found which have the condition the Subject Property will have after the taking. After adjusting for the differences the indicated 'After Value' is subtracted from the 'Before Value' and that amount is considered as just compensation to the owner. In this assignment there were no comparable sales with which to estimate an 'After Value.'"

Thus, Mr. Emig indicated in his appraisal report that he determined the after value of the property using an "alternate method for estimating a market reaction to the change in the property configuration." In his testimony, Mr. Emig described his "alternate method" as follows.

Mr. Emig's opinion that the after value of the property was $55,000 rested on his assumption that the value of a home decreases in direct proportion to the decrease in the distance between the home and the right-of-way. Mr. Emig noted that, on account of the taking, the distance between the Posts' home and the right-of-way had decreased by one third from 120 feet to 80 feet. He testified that the Posts' property, prior to the taking, had an "improvement value" of $60,000. He said that, if the home were moved right next to the right-of-way, it would have only a "salvage value" of $5,000. (Relying on two other "salvage sales," Mr. Emig determined that a buyer would pay $5,000 to move the Posts' home to another location.) Thus, according to Mr. Emig's theory, the Posts' home would decrease in value by $55,000 if the right-of-way were moved from its position 120 feet away directly next to the home. As the right-of-way had been moved only one third of this distance, Mr. Emig reasoned, the home had decreased in value by one third of $55,000, or $18,333, which Mr. Emig rounded down to $18,000. Mr. Emig suggested this amount was the "just compensation" due the Posts. He subtracted it from the before value of $73,000 to arrive at an after value of $55,000.

During cross-examination, Ms. Griffin asked Mr. Emig about his valuation method.

Q. What basis — what do you base that estimate on? Were there any sales in the market that indicate that a house that had set 120 feet from the right-of-way decreases a certain percentage amount for every percent it moves toward the right-of-way?
A. No.
Q. So that's based on what?
A. Logic.
Q. Just your personal opinion?
A. Well, I think it's reasonable to assume that if it is 60 thousand for the improvement, as it is today, and if it were located next

to the highway, and it has a five thousand dollar salvage value, somewhere between those two points value was lost and I'm assuming that as this property gets closer and closer to the highway, the value diminishes and there is a direct relationship between the distance and a value lost. If it's 50 percent closer it's reasonable to say that 50 percent is lost.

Q. Okay. When you say it's reasonable, it's an assumption, is that based on your personal opinion, is that your assumption?

A. It is, that's my professional opinion.

Q. And there's nothing in the market that you found that would prove or disprove that?

A. No, I could not find any.

Q. Are you also aware that although the right-of-way is 40 feet closer to the home that the lanes of traffic, the closest one to the Post home is still 132, well a little more than 132 feet from their house?

A. I was not aware of the exact distances insofar as the distance from the home to the actual pavement.

Q. Okay. Have you examined any properties that were approximately 80 feet from the right-of-way to determine what their values were, what they sold for?

A. No.

Q. You also stated that you found no comparable sales with which to do an after-value, what approach would you call what you did in arriving at an after-value?

A. Well, I'm not sure that there's a specific name given to it.

Q. So, it's not one of the three generally accepted approaches?

A. Well, I think that most appraisers, most appraisal organizations, and the Uniform Standards of Professional Appraisal Practice, allow the appraiser the latitude to use whatever he considers appropriate for solving the value problem, and given the conditions in this case, I did the best that I could.

Q. Did you check for any sales that are 80 feet from the right-of-way or did you just not find any or did you look, search the market for that?

A. We looked for sales anywhere on 167 South that were being directly impacted by this property.

Q. Okay. And you said directly on 167, are your comps — none of your comps from the before-value except the first one is on North 167, were on 167, is that correct?

A. That's correct. . . .

\* \* \*

Q. And also I want to bring up the fact, have you — first I want to ask you: Did you find any sales in the market when you were doing your research that would indicate a direct proportion between the distance of the right-of-way as it moves to the residence and the decrease in value of the residence?

A. I did not.

Ms. Griffin moved to strike Mr. Emig's after-value testimony. She asserted that his opinion on the matter of after value was speculative and lacked a reasonable basis. The Trial Court denied the motion.

▇ The Trial Court erred by refusing to strike Mr. Emig's after-value testimony. Although an expert's opinion is admissible even if the expert fails on direct examination to explain the basis for his conclusions, the testimony must be stricken if the Commission demonstrates on cross-examination "that the landowners' expert witness[ ] had no reasonable basis for [his] opinions." *Arkansas State Hwy. Comm'n v. Johns*, 236 Ark. 585, 586-87, 367 S.W.2d 436, 438 (1963).

Mr. Emig's opinion that the value of the Posts' home would decrease in direct proportion to the decrease in distance between the home and the right-of-way was speculative and lacked a sound and reasonable basis. Mr. Emig conceded that his approach had no specific name and that it was not rooted in the three approaches to valuation previously recognized in eminent domain cases. He offered no foundation for comparing the Posts' home to the two homes that were sold for "salvage value" for the purpose of relocating them elsewhere. Those homes were sold for $3,000 and $5,000, but Mr. Emig did not establish that a buyer would pay a comparable figure for the Posts' home under such circumstances.

We also note that Mr. Emig was unable to point to any market data to corroborate his view that the value of a home decreases in direct proportion to the decrease in distance between the home and the right-of-way. In *Arkansas-Missouri Power Company v. Sain*, 262 Ark. 326, 556 S.W.2d 441 (1977), the landowner's expert witness testified that a newly installed transmission line would reduce the value of the property by $27,197. We held that the testimony was speculative and should have been stricken because

the "expert on cross-examination admitted that he could not think of a single instance where a transmission line had any effect on the market value of the property." *Id.* at 327-28, 556 S.W.2d at 442. "Therefore," we said, "his testimony that the damages amounted to some $27,000 did not have a sound and reasonable basis." *Id.*

■ Mr. Emig's testimony concerning the property's after value lacked a sound and reasonable basis. We must therefore reverse because "[t]he public . . . cannot be compelled to pay prices based . . . upon speculation . . . ." *Arkansas State Hwy. Comm'n v. Roberts,* 246 Ark. 1216, 1221, 441 S.W.2d 808, 812 (1969), *citing Arkansas State Hwy. Comm'n v. Watkins,* 229 Ark. 27, 313 S.W.2d 86 (1958); *Arkansas State Hwy. Comm'n v. Griffin,* 241 Ark. 1033, 411 S.W.2d 495 (1967).

Reversed and remanded.

GLAZE, J., concurs to point out that, by requiring the Commission to present its evidence first, the court caused the Commission to lose any effective right to a directed-verdict motion.