Filed 4/24/26  Flats Management Group v. L.A. County Metro. Trans. Auth. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FLATS MANAGEMENT GROUP, LLC, et al., | B333260, B334627 |
| Plaintiffs and Appellants, | Los Angeles County Super. Ct. No. BC691935 |
| v. | |
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, et al., | |
| Defendants and Appellants. | |

APPEALS from orders and a judgment of the Superior Court of Los Angeles County, Gregory Keosian, Judge.  Affirmed in part, reversed in part, and remanded.

Century Law Group, Edward O. Lear; Evans Kingsbury, Noreen M. Evans for Plaintiffs and Appellants.

Horvitz & Levy, Robert H. Wright and Mark A. Kressel; Lewis Brisbois Bisgaard & Smith, Edward E. Ward, Jr. and Judith J. Steffy for Defendants and Appellants.

————————————

On the southeast corner of Wilshire Boulevard and South Gale Drive in a bustling Beverly Hills neighborhood sits a single-story commercial building that has housed various restaurants and businesses since the 1930s. The physical address of the building is 8400 Wilshire Boulevard.

Two blocks west, at the corner of Wilshire and La Cienega Boulevard, is the location for a subway station that the Los Angeles Metropolitan Transportation Authority ("Metro") had been planning for years in the expansion of its Purple Line westward. Construction on the Wilshire/La Cienega station began in 2015.

2015 was also the year that a new restaurant hoped to open at 8400 Wilshire Boulevard. However, because of the ongoing construction at the Wilshire/La Cienega station, the restaurant's owners delayed their plans twice before officially opening in May 2017.

Despite positive reviews, business at the restaurant was not good.

In January 2018, the restaurant and its landlord sued Metro, the City of Beverly Hills ("City"), and Skanska Traylor Shea, the contractor building the station ("Skanska," and collectively with Metro and City, "Defendants"), bringing claims for inverse condemnation, nuisance, negligence, and intentional interference with contracts.

The restaurant remained open throughout 2018 but closed in January 2019 due to expenses exceeding revenues.

Defendants prevailed at the bench trial on the inverse condemnation claim.  They then moved for a nonsuit on the remaining claims, and the trial court granted the motions by the City and Skanska.  The court denied Metro's nonsuit, allowing the plaintiffs' remaining claims to proceed against Metro.  Then the jury found Metro negligent and awarded over $4 million in damages to the plaintiffs.  The court denied Metro's post-trial motions.

Both sides appealed.

Flats and Simon seek reversal of the trial court's decisions on inverse condemnation and granting nonsuit to the City and Skanska.

City and Skanska moved to dismiss the plaintiffs' appeal against them on untimeliness grounds.

Metro asks that we reverse the judgment against it, contending the trial court erred in denying its motion for judgment notwithstanding the verdict.

Flats and Simon filed a second appeal, seeking reversal of the trial court's post-judgment award of prevailing party costs to City and Skanska.  We consolidated that appeal with the first for purposes of oral argument and decision.

We grant City and Skanska's motion to dismiss the Flats and Simon's appeal against them.  We affirm the trial court's decision on inverse condemnation.  We reverse its decision denying Metro's motion for judgment notwithstanding the verdict and order it to enter judgment for Metro.  We dismiss as moot Flats and Simon's second appeal.  And we remand for proceedings consistent with this opinion.

Undesignated statutory citations refer to the Code of Civil Procedure.

I

We recount the facts and procedural history.

A

When Victor Alexandroff was contemplating retirement, some of his friends found for him what seemed to be an ideal investment property. Alexandroff, a licensed attorney who had practiced since 1987 and worked for over 25 years at the Los Angeles City Attorney's Office, was looking for a way to supplement the income he would receive from his pension. Alexandroff visited the property, located at 8400 Wilshire Boulevard ("Property"). In his own words, he "fell in love with it." Originally built in the 1930's, the Property, a standalone single-story art deco building, has one of the oldest liquor licenses in the state and a history of successful restaurants as tenants, including a sushi restaurant owned by Matt Damon and Ben Affleck. The Property's history, along with its proximity to the Saban Theatre, which hosted many events, impressed Alexandroff.

While he was still doing due diligence and researching the Property, Alexandroff learned that Metro was in the process of expanding its Purple Line and constructing the Wilshire/La Cienega subway station very close to the Property. He understood from his research and the papers he read that the above-ground construction would finish in 2017. Alexandroff thought that in the long run, it would actually be beneficial to own property next to the station.

Alexandroff and his wife, through an entity called Simon A. Management, LLC ("Simon"), purchased the Property at the end of 2013. At the time of purchase, the Property had, as a tenant for several years, a popular high-end restaurant named Red Medicine. Adam Fleischman, a self-taught restaurateur who

4

started the restaurant brands Umami Burger and 800 Degrees Pizza, had founded Red Medicine as a Beverly Hills destination restaurant. Alexandroff thought owning the Property would be "headache free" because Red Medicine would be a good tenant.

Not long after Simon bought the Property, at some point in 2014, Fleischman decided to close Red Medicine to pursue his other restaurants. But around that time, the Property had caught the eye of Kyle Schutte, an up-and-coming chef.

Schutte knew Fleischman and had been working with restaurateurs Lisa Long and Emily Mura-Smith to develop a restaurant concept they named "The Flats," which would serve gourmet flatbreads and sandwiches with an extensive cocktail selection. Mura-Smith and Long had decades of experience running restaurants together. They had previously collaborated with celebrity chef Fabio Viviani, who had appeared on the television series Top Chef, to open an Italian restaurant.

Schutte believed the Property would be the perfect flagship location for their restaurant. Long, Mura-Smith, and Schutte envisioned the restaurant as a concept they could eventually franchise to other locations. Long and Mura-Smith set up an entity called Flats Management Group, LLC ("Flats"), to run the restaurant.

In 2014, Long approached Alexandroff to inquire about leasing the Property. Alexandroff met with Long and learned of her history as an experienced restaurateur who had opened multiple successful restaurants in the past. Given her track record, Alexandroff decided Long was someone that he wanted to work with.

Flats signed a lease with Simon in November 2014, and Alexandroff understood that Long and her team would be doing

5

some renovations at the Property before opening their restaurant.  Fleischman agreed to guarantee the lease for a year.

Long and Mura-Smith were also aware that construction would begin in 2015 near the Property.  Long had experienced Metro's expansion of its Red Line near one of her previous restaurants in North Hollywood.  While the construction was somewhat inconvenient, Long did not feel that it significantly detracted from her restaurant's operations.  Long did not anticipate any problems with the construction near the Property and even touted the Property's proximity to the Wilshire/La Cienega station as a potential boon for business to prospective investors.

Since signing the lease, Long and Mura-Smith continued to make improvements on the Property, including building out the walls to make space for large pizza ovens they had imported from Italy, and getting the necessary permits for their remodeling. Long invested $875,000 of her own money into the business and borrowed additional money to help cover the costs.  By May 2015, Long was satisfied with the progress of renovations and hoped to open the restaurant by the end of the year.  Her hope was that the restaurant would be profitable within two years of opening.

B

At some point in 2015, before the construction began, Long met Mindy Lake, a community relations officer with Metro. Lake's job was to maintain communication with stakeholders in the community and be the liaison between Metro and Skanska as Metro continued to expand the Purple Line through Beverly Hills.  In this capacity, she went door-to-door along the path of the Purple Line extension, introduced herself, and gave people her contact information so they could reach out if they had

6

questions about the construction.  Lake also helped facilitate monthly meetings in the community to provide updates on the construction's progress.

Long told Lake she hoped to open the restaurant in time for the holiday season in 2015, and Lake responded that this was "terrific."  From her discussions with Lake, Long believed that the restaurant's access to Wilshire Boulevard would be closed for no longer than two months at a time and that access to Gale Drive might be "sporadic."

In late August or September of 2015, Long told Lake she was worried the restaurant would not be able to open in time for the holidays because Gale had only limited parking for potential restaurant patrons, and Flats had not yet gotten its valet permits from the City.  Around this time, there was some construction near the Property, and Long heard the sound of jackhammers and saw workers cutting and moving asphalt.

Because of the construction and what Lake had told her, Long decided to delay the restaurant opening and instead focus on a second phase of remodeling to elevate the restaurant's branding.  Long thought Flats might be able to open the restaurant by spring or summer of 2016.

Through early 2016, construction around the Property ramped up.  The amount of construction caused Long to worry that opening in April 2016 was not realistic.  She was concerned that people would not be able to access the restaurant from either Gale or Wilshire.  Long decided to push the opening to Christmas 2016.  After a meeting with Lake and some other people involved in the construction around November of 2016, Long decided to delay the opening again into 2017.

In January 2017, Mura-Smith attended one of the monthly meetings about the construction's progress. Based on what Mura-Smith learned at the meeting, Long, Schutte, and Mura-Smith decided they could open the restaurant in April 2017. Their understanding was that there would be, at a maximum, only two months of above-ground construction directly by the Property. They believed that after April 2017, all construction would move underground, so they could do a soft opening in April and officially open in May 2017. Flats began to hire restaurant staff in March 2017.

By April 2017, however, Metro and Skanska were in the midst of drilling potholes along Wilshire to install soldier piles that would go deep underground to support the excavation of the subway station box. There was still a barrier directly in front of the Property obscuring its view from certain angles, which would remain until the end of June 2017.

Throughout April 2017, noise, dust and vibration from the construction disrupted the ambiance of the restaurant. Patrons had difficulty finding parking. Many of them left. Nonetheless, Long felt that she had no choice but to proceed with the May 1, 2017 opening.

By June 2017, Long thought things in front of the restaurant were looking better. A sidewalk was now open, and Long felt optimistic. By July 2017, there were two lanes open on Wilshire, and at least one lane on Gale was open. Flats got a sidewalk dining permit in the fall of 2017. Sidewalk dining was up and running for a few months before Flats decided to shut it down because of the construction noise.

By December 2017, Schutte had left Flats and Long began to work with other chefs. Long used her payroll from another

restaurant to help with Flats' expenses, which were piling up. She continued to take out loans, including some with extremely high interest rates. Long's efforts kept the restaurant afloat for several months, and the restaurant garnered positive reviews. But the restaurant's revenue was nowhere near what Long and Mura-Smith had projected. Long, Mura-Smith, and Alexandroff believed the construction was the reason for the restaurant's lack of business.

## C

In January 2018, Flats and Simon sued Metro, City, and Skanska for inverse condemnation, nuisance, negligence, and intentional interference with contracts. Their complaint alleged that starting in December 2016, Defendants subjected them to "a continuing nuisance and profound interference and disruption," including obstruction with their free use of the Property; obstruction of sidewalks and public streets; the placement of fences near the Property' entrance; the creation of dust, noise, vibration, and odors; and impairment of ingress and egress for both pedestrian and car access. They further alleged Defendants knew the restaurant "would lose customers and clientele as a result of their careless and insensitive approach to the construction of the [subway] segment" and that Defendants "repeatedly made false representations" about the progress of the construction and Defendants' ability to mitigate inconveniences from the construction.

The restaurant remained open for all of 2018. Sometimes the restaurant was busy. Construction directly in front of the restaurant had ceased. But Flats, which had begun paying rent to Simon in 2014 and had continued to pay rent for over two years before it officially opened, could no longer pay rent to

9

Simon, despite Alexandroff reducing the rent and returning some of the $250,000 security deposit.

Simon evicted Flats in January 2019, shuttering the restaurant.

The Property would remain vacant for over four years. Alexandroff was not able to rent the Property until March 2023, when Simon signed a 20-year lease with Panera Bread. The rent under this lease was substantially below market, and the lease included a provision that any construction in front of the Property would further reduce the rent by half.

D

In September 2020, the parties agreed to bifurcate proceedings: a bench trial for the inverse condemnation claim and a jury trial for the remaining claims.

The five-day bench trial began in January 2022. In addition to Long, Mura-Smith, and Alexandroff, Flats and Simon offered the testimony of restaurateur Adam Fleischman and Victor Zamora, the president of ZG Valet, a Beverly Hills company that Flats had hired to assist with parking.

Long, Mura-Smith, and Alexandroff testified about the ways in which the construction obstructed access to the restaurant, including a staging area that was directly across the street. Mura-Smith described trucks constantly coming in and out of the staging area with large pieces of equipment. Long and Mura-Smith opined that convenient and consistent access was necessary for a restaurant to survive. But Long conceded that access was "intermittent" and was not able to testify as to exactly how long the construction blocked access to the restaurant.

Zamora testified as to the importance of convenient parking for restaurants and his unsuccessful efforts to get a valet parking

10

permit for Flats.  Instead of a normal valet service, Zamora had one of his employees stand outside the restaurant and direct customers to nearby parking facilities.

Fleischman testified about his own experience with the Property and how it appealed to him for his Red Medicine restaurant because of its art deco architecture, freestanding nature, parking lot, visibility on a major street, and beautiful interior.  In his opinion, a successful restaurant in Beverly Hills would need good visibility from the street, valet parking, and aesthetic appeal.  These qualities enabled Fleischman to operate Red Medicine for about five years.  Fleischman testified that this meant Red Medicine was successful because "most restaurants don't make it past a year or two" and the decision to close Red Medicine was "elective."

Defendants presented the testimony of Mohamad Ramlawi, the Skanska manager responsible for the construction activities at the Wilshire/La Cienega station, and Mindy Lake.

Ramlawi, a licensed civil engineer who had started his construction career in 2000, provided an overview of the construction near the Property and the Purple Line expansion project more broadly, along with a timeline of the construction.  The entire Purple Line expansion was 3.9 miles.  Ramlawi said that Metro did the same work all along the expansion.

Ramlawi explained that construction on the south side of Wilshire directly in front of the Property took place over four months, from March 2017 to June 2017.  During this four-month period, at least two lanes in each direction on Wilshire were open.  In June 2017, construction began on the north side of Wilshire.  Ramlawi also testified that Skanska and Metro were contractually mandated to maintain access to the Property at all

11

times.  There was only one week when they completely closed the sidewalk in front of the Property.

Ramlawi also described the "decking" process, which began in September 2017 on Wilshire.  Decking enables above-ground traffic to proceed over underground construction.  Decking only took place on weekends, and entailed Skanska blocking off 120 or 140 feet on Wilshire, removing the pavement, excavating enough to expose the utilities, covering the hole with a pre-cut deck panel, and paving it in time for Monday morning traffic.  There was one weekend in December 2017 where Skanska did decking directly in front of the Property.  After that weekend, there was no further construction activity at the street level in front of the Property.

Throughout the construction, Ramlawi maintained that it was possible to get to the Property because Skanska and Metro never blocked the building or doors.  If Skanska and Metro did close a sidewalk, it "always created a way-finding map that was distributed to the residents and to the businesses."

Ramlawi further testified that there were noise limitations that Skanska and Metro had to respect throughout the construction process.  Skanska used sound blankets to block the noise from reaching residential areas.

Lake testified that since she began her job in 2014, it was always possible to access the Property whenever she tried to do so.

In addition to the witness testimony, the court received into evidence many photographs of the construction in front of the Property during the relevant time periods.

In May 2022, the trial court rendered its statement of decision on the inverse condemnation claim.  The court found

there was no taking by Defendants. While finding there to be "no dispute the construction was a major source of aggravation for [Flats and Simon], especially in light of the fact they were attempting to establish themselves as a new, up and coming restaurant," the court concluded this "appears to be a case of bad timing, not a case of a taking under either the California or United States Constitution."

E

In January 2023, Flats and Simon requested dismissal with prejudice of their inverse condemnation claim with respect to Skanska.

The jury trial began in May 2023. The jury heard testimony from the same witnesses who testified during the bench trial, with additional witnesses who testified to Flats and Simon's alleged damages.

Following Flats and Simon's case-in-chief, Defendants moved for nonsuit. On May 24, 2023, the court issued a written order granting the nonsuit motion as to City and Skanska, but denying it as to Metro.

After the defense rested, Metro moved for a directed verdict, which the court denied on the same day.

On May 31, 2023, the jury returned a verdict against Metro on Flats and Simon's negligence claim. The jury awarded $1.7 million in damages to Simon and $2.35 million to Flats.

On July 7, 2023, the trial court entered three documents. First, an order dismissing with prejudice Flats and Simon's action against City and Skanska. Second, a minute order dismissing with prejudice Flats and Simon's complaint against City and Skanska and judgment in Flats and Simon's favor against Metro for the amount of $4,050,000. Third, the proposed

13

judgment form from Flats and Simon that provided a summary of the proceedings and verdict, and ordered dismissal with prejudice of City and Skanska and judgment for Flats and Simon against Metro for $4,050,000.

On July 19, 2023, Flats and Simon filed a notice of entry of final judgment.

On August 23, 2023, Metro filed motions for a new trial and for judgment notwithstanding the verdict. Flats and Simon opposed both.

On September 19, 2023, the court issued a written order denying both of Metro's post-trial motions.

On October 16, 2023, Metro filed a notice of appeal, checking two boxes from the list of appealable orders on the form: the July 7, 2023 judgment after jury trial and the September 19, 2023 order denying its motion for judgment notwithstanding the verdict.

On October 19, 2023, Flats and Simon filed a notice of appeal, seeking review of the court's decisions denying their inverse condemnation claim and granting nonsuit in favor of City and Skanska. The notice specified that Flats and Simon are "NOT APPEALING [THE] VERDICT AS TO THE MTA."

On October 26, 2023, the court held a hearing on the parties' dueling motions to tax costs. That same day, the court issued a minute order granting in part each motion and awarding prevailing party costs to Flats, Simon, City and Skanska.

On December 6, 2023, Flats and Simon filed a notice of appeal, seeking review of the court's order awarding costs to City and Skanska.

On February 1, 2024, City and Skanska moved to dismiss Flats and Simon's appeal against them. Flats and Simon filed

14

their opposition.  We deferred deciding the motion until completion of the briefing in the main appeal.

## II

We first address City and Skanska's motion to dismiss Flats and Simon's appeal against them.

In their motion, City and Skanska correctly argue this appeal is untimely, because the trial court entered an order of dismissal of the entire complaint as the City and Skanska on July 7, 2023, the clerk served the order that same day, the deadline to appeal this order was thus 60 days later on September 5, 2023, and Flats and Simon did not file a notice of appeal until October 19, 2023.

We start by looking at the "one final judgment rule" (see Code Civ. Proc., § 904.1) before turning to the rule extending the deadline to file a notice of appeal in certain circumstances (Rule 8.108 of the Rules of Court).

The one final judgment rule means what it says—that there is generally only one final judgment terminating trial court proceedings from which an appeal may be taken.  (See Code Civ. Proc., § 904.1; *Bank of America v. Superior Court* (1942) 20 Cal.2d 697, 701 ["there can be but one judgment in an action no matter how many counts the complaint contains"].)  It is "a fundamental principle of appellate practice that prohibits review of intermediate rulings by appeal until final resolution of the case" to prevent piecemeal dispositions and multiple appeals in the same case.  (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 697.)

Section 904.1 "provides a list of appealable judgments and orders" and "permits an appeal in any unlimited civil action to be taken from any of 14 enumerated filings."  (*Meinhardt v. City of*

15

*Sunnyvale* (2024) 16 Cal.5th 643, 652.)  "The first such filing, with exceptions not relevant here, is 'a judgment, except an interlocutory judgment.' "  (*Ibid.* (citing § 904.1, subd. (a)(1).)  This judgment must be "not intermediate or nonfinal" but must be the one final judgment.  (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 741 (*Morehart*).)

Flats and Simon argue the one final judgment rule requires us to deny City and Skanka's motion.  Their briefing, however, fails to acknowledge that there are exceptions to the one final judgment rule.  (See, e.g*., In re Baycol Cases I & II* (*Baycol*) 51 Cal.4th 751, 760–762 [explaining that in class actions, the "death knell doctrine" renders appealable an order terminating class claims but allowing individual claims to continue]; *Wong v. Dong* (2025) 112 Cal.App.5th 109, 114–115 [orders granting or denying an anti-SLAPP motion to strike fall within an exception to the "one final judgment rule"].)

As City and Skanska note, another exception to the one final judgment rule exists "in multiparty actions where a judgment or order resolves all of the issues as to one of the parties, in which case that judgment or order is appealable as to that party."  While this type of order is not enumerated in section 904.1 as an appealable order, our Supreme Court has explained it as follows: "[j]udgments that leave nothing to be decided between one or more parties and their adversaries, or that can be amended to encompass all controverted issues, have the finality required by section 904.1, subdivision (a)."  (*Morehart, supra*, 7 Cal.4th at p. 741.)

Appellate courts have recognized and applied the exception in situations similar to the one here.  (See, e,g., *Save Berkeley's Neighborhoods v. Regents of University of California* (2021) 70

Cal.App.5th 705, 714 (*Berkeley*) [appeal properly taken from an order disposing of all issues between the plaintiff and two real parties in interest]; *Heshejin v. Rostami* (2020) 54 Cal.App.5th 984, 991 (*Heshejin*) [order of dismissal resolving all issues as to one set of defendants was appealable]; *Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 588 [declining to dismiss appeal taken from trial court order disposing of all the plaintiff's claims against one defendant, even though "unresolved issues remain" between plaintiff and another defendant]; *Ricketts v. McCormack* (2009) 177 Cal.App.4th 1324, 1337–1338 (*Ricketts*) [dismissing as untimely one party's appeal from the judgment ultimately entered in the case when she failed to appeal an earlier appealable order that resolved all of her claims against the defendant].)  We are therefore satisfied that this final-order-as-to-one-party exception is a sufficiently "bright line" that signals appealability.  (See *Baycol*, *supra*, 51 Cal.4th at p. 761 ["bright lines are essential [in establishing rules of appealability] to avoid both inadvertent forfeiture of the right to appeal and excessive protective appeals by parties afraid they might suffer such a forfeiture"].)

This exception applies here; the July 7, 2023 order dismissing them with prejudice from Flats and Simon's complaint is an appealable order because the order disposes of all claims against them, is in writing, signed by the court, and filed in this action.  (See Code Civ. Proc. § 581d ["All dismissals ordered by the court shall be in the form of a written order signed by the court and filed in the action and those orders when so filed shall constitute judgments and be effective for all purposes, and the clerk shall note those judgments in the register of actions in the case"].)  Specifically, the order states, in relevant part, as follows:

17

"The Court having decided that Defendants [CITY] and [METRO] are not liable for inverse condemnation, judgment is entered for those Defendants on that claim and Plaintiffs [FLATS] and [SIMON] shall take nothing by that claim;

"Pursuant to the Court's May 24, 2023 Order granting in part defendants' motion for nonsuit, Defendants [SKANSKA] and [CITY] are hereby dismissed and Plaintiffs [FLATS] and [SIMON] shall take nothing by way of their complaint against Defendants [SKANSKA] and [CITY]."

This July 7, 2023 order was the final appealable order, under section 904.1(a), as to Flats and Simon's claims against Skanska and City. (See, e.g., *Berkeley*, 70 Cal.App.5th at p. 714; *Heshejin*, 54 Cal.App.5th at p. 991; *Martis*, 53 Cal.App.5th at p. 588; *Ricketts*, 177 Cal.App.4th at pp. 1337–1338.)

Under the Rules of Court, the corresponding deadline for Flats and Simon to file a notice of appeal as to their claims against Skanska and City was September 5, 2023. (Cal. Rules of Court, rule 8.104(a)(3).) They did not do so until more than a month later. Accordingly, Flats and Simon's failure to file a timely notice of appeal doomed their ability to appeal the court's dismissal of their claims against City and Skanska. (See *Baycol*, *supra*, 51 Cal.4th at p. 761 fn. 8 ["California follows a "one shot" rule under which, if an order is appealable, appeal must be taken or the right to appellate review is forfeited"]; see also *Kinoshita v. Horio* (1986) 186 Cal.App.3d 959, 967 ["If [a] ruling *is* appealable, the aggrieved party *must* appeal or the right to contest it is lost"].)

In their opposition, Flats and Simon argue their appeal against City and Skanska is still timely under Rule 8.108 of the Rules of Court, which describes the various circumstances that

18

extend the time to appeal. Specifically, they cite two of these circumstances: posttrial motions and cross-appeals of the same judgment. (See Cal. Rules of Court, rules 8.108(b), (d), (g).)

Posttrial motions, including motions for a new trial and for judgment notwithstanding the verdict, extend for all parties the time to appeal from the judgment until "30 days after the superior court clerk or a party serves an order denying the motion or a notice of entry of that order." (Cal. Rules of Court, rules 8.108(b), (d).) Flats and Simon point out that the document dismissing City and Skanska also included a judgment in their favor against Metro, stating: "Plaintiffs [FLATS] and [SIMON] shall recover from Defendant [METRO] the sum of $4,050,000.00 with interest thereon at the rate of seven percent (7%) per annum from the date of entry of this judgment until paid." They urge us to find that under Rules 8.108(b) and (d), because Metro filed motions for a new trial and for judgment notwithstanding the verdict from the July 7, 2023 judgment against it, which also included the dismissal of City and Skanska, and the trial court denied both on September 19, 2023, the deadline for Flats and Simon to appeal from the July 7, 2023 order dismissing City and Skanska extended from September 5, 2023 to October 19, 2023.

We reject this argument. It would require us to conflate the order dismissing City and Skanska with the judgment resolving Flats and Simon's claims against Metro. Despite being on the same July 7, 2023 document, these are discrete judicial actions on separate tracks. There can be multiple appealable orders on the same document. Flats and Simon are cognizant of this fact on some level, as their notice of appeal specified that they were only appealing the dismissal of City and Skanska and

19

the court's denial of their inverse condemnation claim, and "NOT APPEALING [THE] VERDICT AS TO [METRO]."

Likewise, as City and Skanska note, Metro filed posttrial motions on the judgment against it, *not* the court's order dismissing City and Skanska. Thus, Rules 8.108(b) and (d) only extended the deadline to appeal as to the judgment resolving Flats and Simon's claims against Metro, *not* the order dismissing City and Skanska. Rules 8.108(b) and (d) only came into play here because Metro filed posttrial motions on the judgment against it, and it only applies to Flats and Simon's claims against Metro. Thus, Flats and Simon's appeal against Metro is timely because it also stems from the court's judgment resolving their claims against Metro.

For the same reason, Flats and Simon cannot construe their notice of appeal against City and Skanska as a cross-appeal under Rule 8.108(g) from Metro's notice of appeal. To be clear, Metro's notice of appeal applied only to the judgment against it, and not the order dismissing City and Skanska. All Rule 8.108(g) could do for Flats and Simon is allow a twenty-day window for them to file a cross-appeal from the same judgment from which Metro appealed. And because part of Flats and Simon's appeal did pertain to its claims against Metro, Rule 8.108(g) is an alternative basis to find timely Flats and Simon's appeal against Metro. But the rule does not reach the order dismissing City and Skanska.

Our finding that Flats and Simon's appeal against City and Skanska is untimely is consistent with how appellate courts have ruled on the timeliness of appeals in other contexts involving a party's failure to file a timely notice of appeal of an immediately appealable order. For example, courts have found untimely

appeals that were not based on the trial court's immediately appealable orders resolving anti-SLAPP motions. (See, e.g. *Reyes v. Kruger* (2020) 55 Cal.App.5th 58, 62 [appeal untimely where "the appellants did not appeal from the order granting the anti-SLAPP motions but from the judgment of dismissal that followed later, which they relied on as the appealable order"]; *Melbostad v. Fisher* (2008) 165 Cal.App.4th 987, 995–997 [same]; *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1246–1257 [same].) And in *Williams v. Impax Laboratories, Inc.* (2019) 41 Cal.App.5th 1060, 1071, the plaintiff's failure to appeal an appealable "death knell" order terminating class claims foreclosed her from later attacking the dismissal of her class allegations. (*Ibid.*)

Flats and Simon's appeal against City and Skanska was untimely. We therefore grant City and Skanska's motion to dismiss that portion of Flats and Simon's appeal. The trial court's dismissal of Flats and Simon's claims against City and Skanska will remain undisturbed.

## III

We now proceed to the merits of Metro's appeal and Flats and Simon's cross-appeal. First, we examine the court's statement of decision on Flats and Simon's inverse condemnation claim, which Flats and Simon ask us to reverse. Next, we review the trial court's decision to deny Metro's motion for judgment notwithstanding the verdict, which Metro contends was erroneous. Lastly, we address the trial court's order awarding costs, which is the subject of Flats and Simon's second appeal.

## A

We affirm the trial court's inverse condemnation decision against Flats and Simon.

21

Article 1, section 19 of the California Constitution guarantees "just compensation" whenever the government takes or damages private property for a public use. (*Weiss v. People ex rel. Dept. of Transportation* (2020) 9 Cal.5th 840, 852 (*Weiss*).) An inverse condemnation action is a property owner's procedure to vindicate their constitutional right to just compensation after the government has taken or damaged their property. (*Id.* at p. 853.) The threshold requirement for a property owner in such an action is to establish that the government has, in fact, taken or damaged his or her property before he or she can reach the issue of "just compensation." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 940 (*San Diego*).)

The government "takes or damages" property when it (1) causes physical damage to that property without physically invading it; (2) physically invades that property in any tangible manner; or (3) causes an intangible intrusion burdening the property that is "direct, substantial, and peculiar to the property itself." (*San Diego, supra*, 13 Cal.4th at p. 940.) Whether the government has "taken or damaged" private property is a mixed question of law and fact for the trial court to decide. (*Weiss, supra*, 9 Cal.5th at p. 865.)

In making its legal conclusion that there was no taking by City and Metro, the trial court made the following factual findings. First, the court summarized the conditions facing the restaurant. It found "[a]ll new restaurants face great challenges," and acknowledged Flats and Simon faced many challenges in the "perfect storm" of "opening a restaurant in the midst of metro construction on Wilshire Boulevard in the City of Beverly Hills." While acknowledging that the "[t]he corner upon which the restaurant sat acted as a staging area and apparent

22

storage venue for the large machinery and equipment used during the construction process," the court also found "this was not unique to the Flats location. As the construction moved along Wilshire Boulevard, so did the staging area."

The court went on to describe the construction as "clearly messy, dusty, noisy" and observe that it caused vibrations impervious to the effect of sound blankets, which also temporarily obscured the visibility of the front of the restaurant. The court further noted "[m]ost importantly for [Flats and Simon], they contend access to the restaurant itself was lost due to the closure of Wilshire Boulevard, as well as [Gale]" and that "[t]hey also lost street parking, metered parking and access to their own parking lot at times."

Next, the court found "[t]he injuries sustained by [Flats and Simon] were temporary in nature and there was never a total loss of access." On this issue, the trial court cited the testimony of defense witness Ramlawi, who testified "that the above ground construction on the Flats side of Wilshire Boulevard lasted approximately four months, of which two to three weeks was in front of Flats." The decision additionally noted Long "testified to only inconsistent access, there was always access through the front door during construction," and that when she was questioned about the construction conditions, "she often responded she was unaware of how long the conditions were present."

1

On appeal from a mixed question of law and fact, we independently determine applicable legal principles but defer to the trial court's factual findings. (*Border Business Park, Inc. v.*

23

*City of San Diego* (2006) 142 Cal.App.4th 1538, 1554 (*Border Business Park*).)

Flats and Simon bring both legal and factual challenges to the inverse condemnation decision.  We address each in turn.

a

Before tackling the parties' dispute on the applicable law, we start with what they agree on: the general legal theory of what would constitute a taking in this case.  Both parties cite our decision in *Today's IV, Inc. v. Los Angeles County Metropolitan Transportation Authority* (2022) 83 Cal.App.5th 1137, 1167 (*Today's IV*), a case we decided a few months after the bench trial in this case.  Like the situation here, *Today's IV* involved the intangible intrusion theory of inverse condemnation.  In *Today's IV*, we explained that a substantial impairment of the right of ingress and egress could support an inverse condemnation claim, so long as the intrusion upon access resulted in a burden on the property that is "*direct, substantial, and peculiar* to the property itself." (*Id.* at p. 1171 [emphasis in original].)

The parties disagree, however, on what exactly a "direct, substantial, and peculiar" burden would entail.  While not using those exact words, the trial court essentially found that the access burden on Flats and Simon was *not* direct, substantial, and peculiar, because the burden was temporary, not unique to their property, and never fully deprived them of access.  In so finding, the court relied on the following cases: *People ex rel Department of Public Works v. Ayon* (1960) 54 Cal.2d 217, 228 (*Ayon*); *Heimann v. City of Los Angeles* (1947) 30 Cal.2d 746, 755 (*Heimann*), overruled on other grounds by *Los Angeles County v. Faus* (1957) 48 Cal.2d 672, 679; and *Border Business Park*, *supra*, 142 Cal.App.4th at pp. 1554–1557.) Citing *Boxer v. City of Beverly*

24

*Hills* (2016) 246 Cal.App.4th 1212, 1222, the court also found that "[i]mpairment to visibility does not in and of itself constitute a taking or compensable damage."

Flats and Simon argue the trial court defined "access" too narrowly. Citing *Rose v. State* (1942) 19 Cal.2d 713, 729 (*Rose*), they believe the court should have given more weight to the property's history of successful restaurants, and the nature of the restaurant business in Beverly Hills, which, according to their witnesses Zamora and Fleischman, requires a high degree of curb appeal, reliable and convenient parking, and ease of entry. They cite *People v. Ricciardi* (1943) 23 Cal.2d 390, 399 (*Ricciardi*) for the notion that "[a]n owner also has an easement of reasonable view of their property from the adjacent roadway." Flats and Simon's definition of a "direct, substantial, and peculiar" access burden would thus include interference with the visibility of the restaurant's storefront and a customer's ability to locate the restaurant easily and park nearby or leave their car with a valet.

Defendants counter that Flats and Simon's proposed definition of "access" is "contrary to law," and that the trial court properly defined "access" as "access to the property *as property*, not access to the specific type of *business* using the property."

Defendants are right. Courts have consistently used a literal definition of the word "access" and never defined "access" differently for business owners facing commercial losses in the face of public works projects. (See, e.g.*, Ayon, supra*, 54 Cal.2d at p. 228 ["[i]t is often necessary to break up pavement, narrow streets and provide inconvenient modes of ingress and egress to abutting property during the time streets are being repaired or improved. Such reasonable and temporary interference with the property owner's right of access is noncompensable"]; *Holloway v.*

25

*Purcell* (1950) 35 Cal.2d 220, 230 [no taking in highway relocation despite potential loss in business because plaintiffs were not "deprived of access as abutting owners" and had no right to the continued flow of traffic past their business establishments]; *Heimann*, *supra*, 30 Cal.2d at p. 756 ["[m]erely rendering private property less desirable for certain purposes . . . will not constitute the damage contemplated by the constitution"]; *Today's IV*, *supra*, 83 Cal.App.5th at pp. 1171–1172 ["[t]raffic detours and delays cannot be characterized as burdens that are direct and substantial such that it is not far removed from a direct physical intrusion"]; *Hecton v. People ex rel. Dept. of Transportation* (1976) 58 Cal.App.3d 653, 657 (*Hecton*) [shopping center owner's losses of revenue due to adjacent freeway construction could not support an inverse condemnation claim because owner still had access and there was "no authority for the proposition that plaintiffs have a right to continued availability of a particular clientele that has patronized in the past the particular commercial ventures developed by plaintiffs on their property"].)

The cases cited by Flats and Simon do not help them. In *Rose*, the plaintiffs sued for inverse condemnation under an impairment of access theory after a public construction project near their property turned a 66-foot thoroughfare with four lines of traffic and 12-foot sidewalks into two "blind" one-way lanes 14 feet wide for vehicular traffic, and 3.6 feet wide for pedestrians on either side of a 24-foot underpass. (*Rose*, *supra*, 19 Cal.2d at pp. 718, 729.) Although the opinion mentions that the plaintiffs' property was in an "industrial" zone, the nature of the plaintiffs' business was ultimately incidental to the Supreme Court's conclusion that a taking had occurred. (See *id.* at p. 729.)

26

Instead, the court focused on the fact that several witnesses testified to the difficulty of gaining access to the property using the "blind" alleyways and the trial judge's personal examination of the property demonstrating that the lane "was too narrow for two vehicles to pass each other if traversing thereon in opposite directions." (*Ibid*.)  The court further clarified that compensable damages could only relate to "interference with the [plaintiffs'] right of access" and *not* any loss in business from the diversion of traffic that the construction caused because "a landowner has no property right in the continuation or maintenance of the flow of traffic past his property." (*Id*. at p. 737.)

Similarly, in *Ricciardi*, the Supreme Court found a taking because a proposed underpass would "effectively block all ingress and egress to and from the main highway [for the property owners] except by traversing the service road… ." (*Ricciardi*, *supra*, 23 Cal.2d at pp. 395.)  Like *Rose*, *Ricciardi* also "recognize[d] that [owners] have no property right in any particular flow of traffic over the highway adjacent to their property, but they do possess the right of direct access to the through traffic highway and an easement of reasonable view of their property from such highway." (*Id*. at p. 399.)  An "easement of reasonable view" simply means that a property must be visible from the street.  (See *id*. at 404 ["it was for the trial court to determine whether the obstruction caused by the underpass would unreasonably cut off [the owners'] property from visibility by travelers on the main highway"].)  It does not, as Flats and Simon would have us find, mean a property owner is entitled to a certain amount of curb appeal.

The trial court rightly used the standard definition of the word "access" for purposes of inverse condemnation.

27

b

Flats and Simon dispute the trial court's factual findings that "there never was a total loss of access" and that the access interference was "temporary," claiming the trial court should have given more weight to the testimony of "witnesses with restaurant expertise," such as Mura-Smith, Long, Zamora, and Fleischman, than it did to that of Ramlawi, and the photographs depicting the construction.  They also argue the trial court's factual findings did not account for the evidence they proffered of the way in which City and Metro "targeted" the Property "with construction activities unique to its corner location."

In their response, Defendants contend Flats and Simon have forfeited their challenge to the trial court's factual findings because they failed to explain how these findings were not supported by substantial evidence, did not address any evidence the trial court cited, and instead rehashed "the evidence they claim supports *their* view of the facts" in an attempt to relitigate these facts on appeal.  And citing our decision in *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–582 (*Schmidt*), they note that our review of the trial court's factfinding at a bench trial must be "highly deferential" to the parties who prevailed at trial and that Flats and Simon bear an "enormous burden" in challenging the trial court's factfinding.  Once again, Defendants are correct.

In *Schmidt*, we described the three pillars of reviewing a trial court's bench trial factfinding as follows: accepting all evidence supporting the trial court's order; completely disregarding contrary evidence; and drawing all reasonable inferences to affirm the trial court.  (*Schmidt*, *supra*, 44 Cal.App.5th at p. 581.)  We also stated that "[o]ur job is only to

28

see if substantial evidence exists to support the [judgment] in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Id.* at p. 582.)

Flats and Simon's factual challenges to the trial court's ruling essentially amount to a request to reweigh the evidence, which the standard of review forbids. (See *Schmidt*, *supra*, 44 Cal.App.5th at p.586; see also *Vasquez v. LBS Financial Credit Union* (2020) 52 Cal.App.5th 97, 109.) The trial court was undoubtedly aware that Mura-Smith, Long, and Alexandroff testified to a lack of "access" as they wished to define the term. But the court was well within its discretion not to credit this testimony and instead find probative Ramlawi's testimony on the issue of access. (See *Schmidt*, *supra*, 44 Cal.App.5th at p. 582 ["the trial court is the sole judge of witness credibility" [internal quotation marks omitted].]) Ramlawi testified that, while construction was in front of the Property, it was nonetheless always possible for someone to get to the Property. Aside from one week, the sidewalk in front of the restaurant was always open. And there were always two westbound lanes and two eastbound lanes of traffic open on Wilshire. This is substantial evidence supporting the court's factual finding that there was sufficient access to the Property.

Moreover, Flats and Simon's repeated claim that there was evidence of construction "targeting" the Property cannot disprove the trial court's factual finding that the construction burdens were "not unique to the Flats location" because the construction and staging areas moved along Wilshire Boulevard. In making this finding, the trial court properly relied on substantial evidence—namely, Ramlawi's testimony that the nature of the

work in front of the Property was the same work Metro completed along all 3.9 miles of the subway expansion.

Another problem with Flats and Simon's factual challenge is their failure to provide a fair summary of the evidence. As the appellants contesting the sufficiency of the evidence, Flats and Simon had the burden of marshalling all of the record evidence and to demonstrate affirmatively its insufficiency to sustain the trial court's findings. (See *Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 621.) Instead, Flats and Simon spend a great deal of their opening brief rehashing evidence favorable to them, including Long and Mura-Smith's long and successful history in the restaurant industry, Fleischman's experience with the Property and Beverly Hills, and their opinions of how the construction affected the restaurant's operations. And they ignore unfavorable evidence, including the testimony of their own witnesses that contradicted their theory that the construction impaired the access so much that it led to the failure of the restaurant. For instance, Long admitted that the construction disruption was "intermittent" and that in June 2017 she felt "optimistic" on days when there was less construction. And Fleischman, who testified to observing "a perfect storm of access problems" at the Property during construction and opined that a Beverly Hills restaurant could not survive only on pedestrian traffic, nonetheless admitted that "most restaurants don't make it past a year or two."

Flats and Simon's factual challenges to the inverse condemnation decision therefore fail.

## 2

In sum, the trial court made detailed and substantiated factual findings about the burdens the construction inflicted on

30

Flats and Simon. And it properly determined these burdens did not amount to a taking. Accordingly, we need not consider Flats and Simon's remaining argument that the court erred in not making separate findings as to Simon's additional damages, for they never established City or Metro took their property.

B

We reverse the judgment against Metro. The trial court should have granted Metro's motion for judgment notwithstanding the verdict because Metro is immune to common law negligence under the Government Claims Act, Government Code, § 810 et seq. ("Act").

1

In Flats and Simon's operative complaint, the negligence count cites Government Code § 815.4, which makes public entities liable for the tortious acts or omissions of their independent contractors, and alleged that Metro and City was liable for the acts and omissions of Skanska.

Metro's answer to the complaint includes an affirmative defense in asserting it is "not liable except as provided by statute and is otherwise immune from liability under state, federal, and local laws and regulations."

After the trial court granted Skanska's nonsuit motions, Flats and Simon asked the trial court to instruct the jury using CACI No. 400, the common law negligence instruction. They do not dispute that they did not assert a statutory basis for Metro's liability before the jury trial. Thus, according to their request, the trial court instructed the jury as follows on their negligence claim:

"[Flats and Simon] claim[] that [they] were harmed by [Metro]'s negligence.

31

"To establish this claim, [Flats and Simon] must prove all of the following:

"One, that [Metro] was negligent.

"Two, that [Flats and Simon] were harmed.

"And three, that [Metro's] negligence was a substantial factor in causing [Flats and Simon] harm.

"Negligence is the failure to use reasonable care to prevent harm to oneself or to others. A person can be negligent by acting or by failing to act.

"A person is negligent if that person does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation.

"You must decide how a reasonably careful person would have acted in defendant [Metro's] position."

It was not until Metro filed its motion for judgment notwithstanding the verdict that Metro explicitly raised the Act, and the legal principle that "[t]he liability of a governmental entity is entirely statutory," citing Government Code §§ 815, subdivision (a) (§ 815(a)) and 815.2, subdivision (b) (§ 815.2(b)).

Then, in their opposition to Metro's motion, Flats and Simon raised for the first time a statutory basis for Metro's liability: Government Code § 815.6 (§ 815.6), which allows for liability against public entities if they fail to discharge "a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury."

The court heard argument from both sides on Metro's motion. Metro's counsel stated: "I want to turn back to those immunities directly tied to the case, Government Code [sections] 815(a) . . . I'd ask the court to take another look at those

immunities." Then, the court, in discussing whether it was "error in instructing on just a standard negligence in a case like this," stated: "I think I made that call, and I don't think it was [error]."

In its written order denying Metro's motion, the trial court made no mention of §§ 815(a), 815.2(b) or 815.6. The court evidently found viable Flats and Simon's negligence theory, which the court described as "includ[ing] a communicative element, e.g., 'not getting the information properly in order to make a decision when we could have ," along with Metro's "failure to mitigate the impact of their construction and to guarantee access to Plaintiffs' restaurant." The court then concluded that "[s]ubstantial evidence exists to support these contentions."

2

Metro's appeal of the judgment against it raises a purely legal issue of statutory interpretation and applying the law to undisputed facts: whether the trial court erred in not finding it immune to Flats and Simon's negligence claim under the Act. We independently review this question. (See *Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598.)

The Act "is a comprehensive statutory scheme governing the liabilities and immunities of public entities and public employees for torts." (*Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 803 (*Quigley*).) "The basic architecture of the Act is encapsulated in Government Code section 815. Subdivision (a) of that section makes clear that under the [Act], there is no such thing as common law tort liability for public entities; a public entity is not liable for an injury '[e]xcept as otherwise provided by statute." (*Id.* [citing Gov. Code, § 815].)

33

Flats and Simon do not dispute that their complaint no longer identified a valid statutory basis for Metro's liability following the court's dismissal of Skanska as a defendant. And they never amended their original complaint to add additional statutory bases for liability. They did not raise § 815.6 as a statutory basis for liability until *after* they asked the court to instruct the jury using CACI No. 400 and Metro filed its post-trial motions.

On the flip side, while Metro included a broad government immunities affirmative defense in its answer, it did not reference § 815(a) by name until it filed its motion for judgment notwithstanding the verdict. In its earlier efforts to defeat the negligence claim, Metro's motions for nonsuit and for a directed verdict only argued it had no duty to Flats and Simon and that there was no causation.

Flats and Simon argue that Metro waived its immunity under the Act by not objecting to the use of CACI No. 400, by failing to ask for a jury instruction on governmental immunity, and by "failing to litigate the defense until this appeal." The main case they rely on is *Quigley*, *supra*, 7 Cal.5th at p. 807–815, where the Supreme Court held that immunity under the Act is not a jurisdictional bar to liability but an affirmative defense that a defendant can forfeit if they do not adequately invoke it.

The contentions of Flats and Simon lack merit. Metro is correct that *Quigley* does not help Flats and Simon because they did not have a viable statutory basis for liability against Metro during the jury trial, and it was their burden to identify such a statutory basis once the court dismissed Skanska from the case. (See § 815(a); see also *Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 795 [because government tort liability is

34

based on statute, "to state a cause of action against a public entity, every fact material to the existence of its statutory liability must be pleaded with particularity"]; *Foster v. County of San Luis Obispo* (1993) 14 Cal.App.4th 668, 672 [a plaintiff must identify in a pleading a public entity's statutory duty because "all government tort liability is dependent upon the existence of an authorizing statute"]; *Searcey v. Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 802 [same].)  Flats and Simon did not try to fix this problem until it was too late, and not until after the jury had rendered a verdict of common law negligence against Metro.

As for jury instructions, it is true that each side has the duty to deliver to the court "all proposed instructions to the jury covering the law as disclosed by the pleadings."  (Code Civ. Proc. § 607a.)  But it was not Metro's obligation to help Flats and Simon craft a viable theory of negligence by objecting to the use of CACI No. 400 in order to preserve this issue for appeal.  (See *Hensley v. Harris* (1957) 151 Cal.App.2d 821, 825 [a party "has no duty to propose instructions which relate only to the opposing theories of his adversary, and having no duty respecting them he has no responsibility for the latter's mistakes"].)  Nor did Metro's failure to request a special jury instruction on government immunity result in forfeiture of its ability to challenge Flats and Simon's instructions "that erroneously contain legal standards inapplicable to the facts."  (See *Alaniz v. Sun Pacific Shippers, L.P.* (2020) 48 Cal.App.5th 332, 339.)

Lastly, while Flats and Simon are wrong that Metro did not litigate this immunity defense until its appeal, Metro did not explicitly raise the Act until its post-trial motions.  Given the obvious applicability of the Act to Metro's defense, it is surprising

that Metro did not raise the Act earlier in the proceedings.  This case is now in its ninth year.  While we cannot turn back time, we can correct the trial court's reversible error.  This error, giving the jury CACI No. 400 and thereby allowing it to render a verdict contrary to the Act, was a miscarriage of justice.  (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)  We are certain that the jury would not have reached this verdict in the absence of the trial court's error.  (See *id.*)  We therefore reverse the judgment against Metro.

Because the trial court committed legal error in allowing Flats and Simon's fatally flawed negligence claim, we remand the case for the entry of judgment in Metro's favor.  (See, *e.g.*, *Kim v. New Life Oasis Church* (2025) 115 Cal.App.5th 659, 669) We need not address the parties' remaining arguments about the applicability of § 815.6 or whether the negligence claim was actually about negligent misrepresentation.

C

Our reversal of the judgment against Metro automatically vacates the cost award from which Flats and Simon filed their second appeal.  (See *Ducoing Management, Inc. v. Superior Court* (2015) 234 Cal.App.4th 306, 314.)  This appeal is now moot and we accordingly dismiss it.  (See *Sturgell v. Dept of Fish & Wildlife* (2019) 43 Cal.App.5th 35, 43.)

**DISPOSITION**

We dismiss Flats and Simon's appeals against City and Skanska.  We reverse the judgment against Metro, vacate the associated award of costs, and order the trial court to enter judgment in Metro's favor.  In all other respects, the judgment and orders are affirmed and we remand this matter to the trial

36

court for proceedings consistent with this opinion.  Metro, City, and Skanska shall recover their costs on appeal.


WILEY, J.

We concur:


STRATTON, P. J.


SCHERB, J.